**CRIMINAL COMPLAINT**

Commonwealth of Virginia

RULES 3A:3 AND 7C:3

STAUNTON

........................................................
CITY OR COUNTY

[X] General District Court
[ ] Juvenile and Domestic Relations District Court

Under penalty of perjury, I, the undersigned Complainant swear or affirm that I have reason to believe that the Accused committed a criminal offense, on or about

9/9/2022
........................................................ in the [X] City [ ] County [ ] Town
DATE OFFENSE OCCURRED

of STAUNTON

I base my belief on the following facts: (Print ALL information clearly.)

On September 9, 2022, Donald Smith testified in a case against me in the Augusta County General District Court. The case was styled Commonwealth of Virginia v. Michael Phillips. I stood trial on 9/9/22 and was found NOT GUILTY of violating the county's noise ordinance by Judge Helvin. The trial occured at 6 E Johnson Street, Staunton, Virginia. The crime occured in the morning, between 10am and 12pm. I am attaching a copy of the trial transcript to this complaint as "Exhibit A". Smith was called as a witness by the Commonwealth, in order to establish elements of my charge. (Please See Attached Exhibit A: Trascript from Sept. 9, 2022 trial, Augusta GDC, p.26). On cross examination, my attorney (Amina Matheny-Willard) asked Sheriff Smith the following question: BY MS. MATHENY-WILLARD: Q. Have you ever lied to a federal investigator on a federal case? Mr. Smith responded by stating: A. No, ma'am. The question was asked after the Sheriff provided inconsistent statements about the location of the property line, a key element of the offense with which I was charged. Furthermore, an affirmative answer from the Sheriff would mean that the Sheriff of Augusta County was a Brady officer. According to the sworn affidavit of Special Agent Tami Ketham, she interviewed Smith in the criminal investigation of witness tampering by Felix Chujoy in May and June of 2015. SA Ketham confirms that her investigation involved requests from Chujoy, to Smith and others, to tamper with witnesses in a federal prosecution. Ketcham confirms that Smith accepts nine separate telephone calls from Chujoy originating at the Rockingham County Jail. She confirms that this is a practice used to evade detection of jail calls by law enforcement. Ketcham wrote" Smith stated that he received one telephone call from F. Chujoy in March 2015 about picking up his mail, but did not mention any other telephone calls or any jail letters to/from F. Chujoy at either of his interviews in May and June 2015." The affidavit, attached as EXHIBIT B, details EXTENSIVE communications between Smith and Chujoy about witnesses against Chujoy. He lied to a federal agent in 2015, and he lied abot it on 9/9/2022 in the City of Staunton, while he was subjected to a laewfully administered oath, about a material matter.

The statements above are true and accurate to the best of my knowledge and belief.

In making this complaint, I have read and fully understand the following:

- By swearing to these facts, I agree to appear in court and testify if a warrant or summons is issued.
- The charge in this warrant cannot be dismissed except by the court, even at my request.

PHILLIPS, MICHAEL ALLEN
........................................................
NAME OF COMPLAINANT (LAST, FIRST, MIDDLE)
(PRINT CLEARLY)

........................................................
SIGNATURE OF COMPLAINANT

Subscribed and sworn to before me this day.

........................................................
DATE AND TIME

........................................................
[ ] CLERK    [ ] MAGISTRATE    [ ] JUDGE

FORM DC-311 REVISED 07/11

---

**CRIMINAL COMPLAINT**

ACCUSED:  Name, Description, Address/Location

SMITH, DONALD LEE
........................................................
LAST NAME, FIRST NAME, MIDDLE NAME

127 LEE HWY
........................................................

VERONA, VA 24482
........................................................

COMPLETE DATA BELOW IF KNOWN

| RACE | SEX | BORN | | | HT. | | WGT. | EYES | HAIR |
|------|-----|------|-----|-----|-----|-----|------|------|------|
| | | MO | DAY | YR | FT | IN | | | |
| W | M | | | | | | | | |
| SSN | | | | | | | | | |

[X] Complainant is not a law-enforcement officer or animal control officer. Authorization prior to issuance of felony arrest warrant given by
   [ ] Commonwealth's attorney
   [ ] Law-enforcement agency having jurisdiction over alleged offense

........................................................
NAME OF PERSON AUTHORIZING ISSUANCE OF WARRANT

........................................................
DATE AND TIME AUTHORIZATION GIVEN

**Michael Phillips**
47 South Windsong Ct
Fishersville, VA 22939
Email: mikephillipsblmsv@gmail.com
Tel.: 540.836-7282

September 16, 2022

**Jeffrey Gaines**
**Commonwealth Attorney**
City of Staunton
21 N. New Street
Staunton, VA 24401
gainesjd@ci.staunton.va.us
*Delivered Via Hand Delivery*
*Delivered Via E-mail*

## RE: *Felony Criminal Complaint – Perjury, and Request for Special Prosecutor*

**Dear Mr. Gaines:**

My name is Mike Phillips, and I am the Vice President of Black Lives Matter Shenandoah Valley. I have not had any experience with your office, but I have had experience with the Staunton PD. Overall I have been fairly impressed with that agency's response, and I am hopeful that fairness extends to your office.

On September 9, 2022, I stood trial in the Augusta County General District Court, located at 6 E Johnson Street, Staunton, Virginia. I was charged by the Augusta County Sheriff's Office with violating the County's noise ordinance. I was found "Not Guilty" and the Judge noted that my arrest was a Constitutional violation.

The reason for my request, which is more fully set forth in the attached criminal complaint, is related to testimony provided, under oath, by Augusta County Sheriff Donald Smith. Smith was called as a witness by the Commonwealth, in order to establish elements of my charge. (Please See Attached Exhibit A: Transcript from Sept. 9, 2022 trial, Augusta GDC). On cross examination, my attorney (Amina Matheny-Willard) asked Sheriff Smith the following question:

```
BY MS. MATHENY-WILLARD:
Q. Have you ever lied to a federal investigator
on a federal case?
```

Mr. Smith responded by stating:

```
A. No, ma'am.
```

The question was asked after the Sheriff provided inconsistent statements about the location of the property line, a key element of the offense with which I was charged. Furthermore, an affirmative

1

answer from the Sheriff would mean that the Sheriff of Augusta County was a Brady officer, which I am sure is difficult to believe. However, the record speaks for itself.

According to the sworn affidavit of Special Agent Tami Ketcham (See Attached Exhibit B: Affidavit of Tami Ketcham), she interviewed Smith in the criminal investigation of witness tampering by Felix Chujoy in May and June of 2015. SA Ketcham confirms that her investigation involved requests from Chujoy, to Smith and others, to tamper with witnesses in a federal prosecution. Ketcham confirms that Smith accepts nine separate telephone calls from Chujoy at the Rockingham County Jail. She confirms that this is a practice used to evade detection of calls by law enforcement.

In summarizing her May and June, 2015 interviews with Smith, Ketcham confirms:

**"Smith stated that he received one telephone call from F. Chujoy in March 2015 about picking up his mail, but did not mention any other telephone calls or any jail letters to/from F. Chujoy at either of his interviews in May and June 2015."**

There is no question that Smith lied to the Agent. She confirms that he received 9 separate calls, and that they were made using fraudulent efforts to avoid law enforcement protection. Therefore, when Smith stated that he had never "lied to a federal investigator on a federal case", he committed perjury, in violation of Virginia Code § 18.2-434.

I absolutely understand if you are too close to the people involved to handle my criminal complaint without bias. For that reason, and anticipating a likely conflict, I formally request the immediate appointment of a special prosecutor to consider my allegations that Smith has violated Virginia Code § 18.2-434 and others related to his actions on September 9, 2022.

Lastly, please do not tell me that I need to file these charges in Augusta County. The crimes occurred in your jurisdiction. My attorney has advised me that Staunton City is appropriate for venue as the crime occurred in the City. I provide the following as reference as it relates to my request for you to appoint a special prosecutor for the City of Staunton to investigate the crime of perjury which occurred at 6 E Johnson St, Staunton, by Donald Smith on September 9, 2022.

> *A crime must generally be tried where it occurred; a concept referred to as venue. Gerald v. Commonwealth, 295 Va. 469, 482, 813 S.E.2d 722 (2018) (quoting Garza v. Commonwealth, 228 Va. 559, 566, 323 S.E.2d 127 (1984)). More precisely, venue is the territorial jurisdiction authorizing the court to adjudicate among the parties at a particular place; Porter v. Commonwealth, 276 Va. 203, 230, 661 S.E.2d 415 (2008).Tanner v. Commonwealth, 72 Va. App. 86, 94, 841 S.E.2d 377, 381 (2020) Since the Albemarle County Courthouse is located within the city limits of Charlottesville, it is within and subject to the joint jurisdiction of the county and city authorities and officers.; Id. (emphasis added).*

Finally, I request that the Special Prosecutor also be tasked to determine whether Smith's 2015 statements to a federal agent during a law enforcement interview, and his perjurious testimony of September 2022, require his addition to Virginia's list of impeached LEOs consistent with Brady v. Maryland.

My friends and I had our rights trampled for a year. We were subjected to harassment at the hands of people who are supposed to know better. I would ask that you consider my request and inform me, or my counsel, of your decision to appoint a special prosecutor. If I do not hear from you by Monday close of business, I will assume that you do not intend to appoint a special prosecutor, and that instead you intend to cover up for the ongoing corruption here. My friends and I will make efforts to protest and inform the people of the City of Staunton of any efforts to protect the Sheriff of Augusta County from facing justice.

Thank you for your time and thoughtful consideration.

Sincerely,

Michael Phillips

Bonnie Chapman

Stephen Nelson

Samuel Orlando

Cameron Turley

McKenzie McQueary

Ismael Barrios

Olivia Chavez

Antwhon Suiter

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Gaines Letter |
| **FILE NAME** | MP Gaines Letter.pdf |
| **DOCUMENT ID** | 8787e5857e3d4ce1cc607ee79d09bf1ff651e51d |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

## Document History

|  |  |  |
|---|---|---|
| ↻ **SENT** | **09 / 16 / 2022** 20:24:48 UTC | Sent for signature to Antwhon Suiter (blmsvva@gmail.com) from tshipe@nexushelps.com IP: 50.242.38.101 |
| ◉ **VIEWED** | **09 / 16 / 2022** 20:28:07 UTC | Viewed by Antwhon Suiter (blmsvva@gmail.com) IP: 107.116.79.40 |
| ↙ **SIGNED** | **09 / 16 / 2022** 20:28:44 UTC | Signed by Antwhon Suiter (blmsvva@gmail.com) IP: 107.116.79.40 |
| ✓ **COMPLETED** | **09 / 16 / 2022** 20:28:44 UTC | The document has been completed. |

Powered by **HELLOSIGN**

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

```
 1                    VA:  IN THE GENERAL DISTRICT COURT
                         FOR THE COUNTY OF AUGUSTA
 2

 3
                                        )
 4                                      )
      COMMONWEALTH OF VIRGINIA,         )
 5                                      )
                                        )
 6                 Plaintiff,           )
                                        )
 7    V.                                )
                                        )
 8                                      )
                                        )
 9    CAMERON TURLEY, et al,            )
                                        )
10                 Defendant.           )

11

12
      JUDGE:             HONORABLE STEVEN HELVIN
13
      DATE:              SEPTEMBER 2ND, 2022
14
      TIME:              9:00 A.M.
15
      LOCATION:          AUGUSTA GENERAL DISTRICT COURT
16                       6 EAST JOHNSON STREET
                         STAUNTON, VIRGINIA  24401
17
      REPORTED BY:       LAURA B. BALLENGEE, CER
18                       SIGNATURE COURT REPORTING, LLC
                         515 FROG POND ROAD
19                       STAUNTON, VIRGINIA  24401
                         (540) 849-8325
20

21

22

23

24

25
```

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

```
 1                          APPEARANCES

 2


 3   On behalf of the Plaintiff(s):

 4                    Lorna Port, Esquire
                      Commonwealth Attorney's Office
 5                    6 East Johnson Street
                      Staunton VA 24401
 6                    (540) 245-5313

 7


 8   On behalf of the Defendant(s):

 9                    Amina Matheny-Willard, Esquire
                      999 Waterside Drive
10                    Norfolk VA 23510
                      (757) 777-7411
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1                        I N D E X

2

EXAMINATIONS                                      PAGE

3  TESTIMONY OF LESLIE SNYDER:
   DIRECT EXAMINATION BY MS. PORT.............   12

4  TESTIMONY OF DUSTY CLYMORE:
   DIRECT EXAMINATION BY MS. PORT.............   15

5  TESTIMONY OF LESLIE SNYDER:
   DIRECT EXAMINATION BY MS. PORT.............   18

6  TESTIMONY OF DONALD SMITH:
   DIRECT EXAMINATION BY MS. PORT.............   22

7  CROSS EXAMINATION BY MS. MATHENY-WILLARD...   26
   TESTIMONY OF DUSTY CLYMORE:

8  DIRECT EXAMINATION BY MS. PORT.............   29
   CROSS EXAMINATION BY MS. MATHENY-WILLARD...   36

9

10 EXHIBITS
   Photographs                                    14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

```
 1                  P R O C E E D I N G S
 2           THE COURT:  How are counsel?  Nice seeing you
 3  again.
 4           MS. PORT:  Likewise, your Honor.
 5           THE COURT:  I have some stuff to start off
 6  with that's going to hopefully simplify our case a
 7  little.  This is going to be tried today.  No more
 8  delays.  To the people here, it's been very difficult
 9  for you.  I was sick and that was the reason.  Some of
10  these continuances were on the law and that kind of
11  thing.  And they can't be avoided, but it doesn't make
12  your time less important.  And I apologize to you, and I
13  appreciate the courteous manner in which y'all have
14  accepted this kind of drag out stuff with the court.
15  But this is important cases in many ways.
16              Counsel, if there's problems with abuse of
17  process or witnesses being subpoenaed and that kind of
18  thing, there are sanctions for this, as y'all both know.
19  Civil.  There are criminal sanctions.  They're even bar
20  ethics if you call a witness for the purposes of
21  harassment.  But I don't decide that because I'm here to
22  decide these people's cases today and not those kind of
23  problems.
24           MS. PORT:  Yes, your Honor.
25           THE COURT:  If you have them, you know, I
```

1   won't be deciding them.  I read your briefs.  And let me

2   compliment, Ms. Port and Ms. Matheny-Willard, on your

3   briefs.  They were excellent.  Very seldom do you get in

4   General District Court such a good brief.  And I've been

5   a judge for 40 years and a good brief is really helpful

6   to a judge.

7          And I took the briefs and studied them and did

8   some research on my own.  I have some rulings pre-trial

9   that'll affect the way we do that.  The Dillon Rule

10  violation argument, which is troublesome to a lot of us

11  because Virginia is sort of unique in having the Dillon

12  Rule.  But I don't think it's per se a violation of the

13  first amendment.  It may be unconstitutional in the

14  application in the individual case, but noise ordinances

15  have been pretty much upheld.  They're very broad and

16  they're troublesome to me but they've been upheld.

17         But the application to the content is

18  bothersome to me and the content of free speech cannot

19  be abridged by noise ordinance.  And that's one of the

20  key issues in this case.  This is to you, Ms. Port, the

21  vulgarity statute, I have not run into that.  Not

22  surprisingly, I think.  I agree with the Commonwealth;

23  there are some problems with that.  But is that a

24  separate one issue case?

25         MS. PORT:  Yes, Your Honor.

1          THE COURT:  Is anybody here in that case?

2    What's the name of the defendant?

3          MS. PORT:  There is.  The defendant in that

4    case -- pardon me.  I'll have to look because there's so

5    many defendants here.

6          THE COURT:  Yeah, take your time.

7          MS. PORT:  I believe it's Cameron Turley.

8          MS. MATHENY-WILLARD:  It's Cameron Turley.

9          THE COURT:  Do you represent him?

10         MS. MATHENY-WILLARD:  I represent him if

11   you're talking about cursing abuse and disorderly.

12         THE COURT:  Oh, listen, by the way, I've got

13   your motion.  I've signed it.  So you're counsel, okay.

14   And he's in the courtroom.  Do you represent him?

15         MS. MATHENY-WILLARD:  I do.

16         THE COURT:  He brought the charge.  How are

17   you, sir?

18         MR. TURLEY:  I'm good.  How are you?

19         THE COURT:  He's the plaintiff?

20         MS. MATHENY-WILLARD:  He's the defendant.

21   He's Cameron Turley.  You're talking about David

22   Zimmerman.  David Zimmerman is not in the courtroom.

23         MS. PORT:  He is up in our victim/witness

24   office.  It was a citizen complaint by Mr. David

25   Zimmerman.

1            THE COURT:  Okay.  So we might take that at

2    the end of all the other cases.

3            MS. PORT:  I believe at the very end, yes,

4    your Honor.

5            THE COURT:  I know you're not prosecuting it

6    or --

7            MS. PORT:  I will put -- I will call Mr.

8    Zimmerman as a witness and organize it as I have or as I

9    call the other cases.

10           THE COURT:  That'll be good.  Okay.  Now, I

11   would like to try the cases that are very similar

12   involving the noise ordinance in the parking lot first.

13           MS. PORT:  Yes, your Honor.

14           THE COURT:  And let's try one and see how we

15   go with that, and we'll decide, you know, from that

16   point.  So if you would choose, Madame Commonwealth,

17   your first case and then call your first witness.

18           MS. MATHENY-WILLARD:  Okay.  So you're just

19   doing one?

20           THE COURT:  Yeah.  It may be, Ms.

21   Matheny-Willard, there may be -- and by the way, I

22   enjoyed talking to you on the phone the other day.

23   There may be a similarity and, depending on the ruling,

24   it may make the other cases moot.

25           MS. MATHENY-WILLARD:  I understand.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1          THE COURT:  I'll be quite frank with you.  I
2   have some very constitutional reservations about the
3   noise ordinances in action and whether it's appropriate.
4   It may not be unconstitutional per se but, in
5   application, it may be as to content.  So let's get to
6   that witness.  First witness.
7          MS. PORT:  Yes, your Honor.
8          MS. MATHENY-WILLARD:  And I'm sorry.  The
9   reason I was asking, I had a brief opening.  If you're
10  doing just one case, based on what you said, I wasn't
11  going to --
12         THE COURT:  Thank you.  And you've been very
13  helpful with your brief but I want to get on with the
14  cases.  And then I'll hear you.
15         MS. MATHENY-WILLARD:  Okay.  Well, the opening
16  is in the brief.
17         THE COURT:  Opening is not going to decide
18  this case.
19         MS. MATHENY-WILLARD:  That's fine.  You have
20  enough information, I think.
21         THE COURT:  Thank you.
22         MS. PORT:  And I will have three witnesses for
23  the first case.  Some of them are foundational.
24         THE COURT:  Okay.  You'll need to tell me who
25  is in the first case.

1          MS. PORT:  Absolutely, Your Honor.  The very
2    first case -- I think I have a case number for you.
3    This is going to be three defendants for June 25th.
4    Their names are McKenzie McQueary.
5          THE COURT:  It's not your fault.  It's my
6    hearing.  I need to know the name.
7          MS. PORT:  Yes, Your Honor.  McKenzie
8    McQueary.
9          THE COURT:  Okay.  You need to come up,
10   please, McKenzie.  Are they here?  Okay, come on up,
11   please.
12         MS. PORT:  And then also Michael Phillips.
13   They were three together at the same time as Michael
14   Phillips.
15         THE COURT:  Oh, that were together, okay.
16         MS. PORT:  And then a Cameron Turley.
17         THE COURT:  Well, let's just try one.  Are
18   they all similar?
19         MS. PORT:  It was all kind of in concert
20   together on that first incident on June 25th.
21         THE COURT:  Well, let's just try one and we'll
22   see where we are.  Who would you prefer to try?
23         MS. PORT:  And the only reason we're asking to
24   do all three together is because there is about a 20
25   minute video.  And instead of playing it three different

1   times, it would be best to --

2           THE COURT:  You might have to.

3           MS. PORT:  Yes, Your Honor.

4           MS. MATHENY-WILLARD:  We could pick one

5   without the video.

6           THE COURT:  Once I see it, since there's not a

7   jury here --

8           MS. PORT:  Yes, your Honor.  Just remember it

9   the second and third times.

10          THE COURT:  Right.

11          MS. MATHENY-WILLARD:  Your Honor, before we

12  start, there are some corrections on the docket.  I

13  don't have to make them now.  Normally, I'll make them

14  in advance, but I can do it later.  They're just name

15  corrections, but I can do them later.

16          THE COURT:  Well, please do and let me know

17  which ones as they come up.

18          MS. MATHENY-WILLARD:  Absolutely.

19          THE COURT:  Thank you, counsel.  All right.

20          MS. PORT:  And Michael Phillips is the

21  earliest in time.  Case number is GC217025.

22          THE COURT:  Okay.  Let me find it.  Okay.

23          MS. PORT:  So we'll start with that one.

24          THE COURT:  Okay.  Michael Phillips?

25          MS. PORT:  Yes, Your Honor.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

| | |
|---|---|
| 1 | THE COURT:  Okay.  Is Mr. Phillips here? |
| 2 | Yeah, come on up, Mr. Phillips.  Where would you like |
| 3 | him? |
| 4 | MS. MATHENY-WILLARD:  He can sit over here. |
| 5 | THE COURT:  So it's a lot easier.  It's |
| 6 | important to be able to confer.  All right.  Let me get |
| 7 | the charges here.  I see.  He's got two charges of the |
| 8 | noise ordinance. |
| 9 | MS. MATHENY-WILLARD:  Yes, your Honor. |
| 10 | THE COURT:  How does the defendant plea? |
| 11 | MS. MATHENY-WILLARD:  Not guilty, your Honor, |
| 12 | to both. |
| 13 | THE COURT:  First witness? |
| 14 | MS. PORT:  My first witness will be Lieutenant |
| 15 | Leslie Snyder. |
| 16 | THE COURT:  Was there a motion to exclude |
| 17 | witnesses? |
| 18 | MS. MATHENY-WILLARD:  Normally I would have |
| 19 | done a motion to exclude but I think all of the |
| 20 | Commonwealth's witnesses are all out.  Is that correct? |
| 21 | MS. PORT:  I believe so. |
| 22 | THE COURT:  Is there any reason for them to be |
| 23 | out? |
| 24 | MS. PORT:  Just to keep the courtroom from |
| 25 | being over crowded.  We've put them all in some |

1    different rooms around the building.

2           THE COURT:  Well, as long as everybody's

3    happy.

4           MS. MATHENY-WILLARD:  Normally I would have a

5    problem with that but there's a lot here.

6           THE COURT:  How are you?

7           THE WITNESS:  Hello.

8           THE COURT:  Thank you for your patience.  Do

9    you solemnly swear the evidence you're about to give

10   will be the truth?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Your name, please?

13          THE WITNESS:  Lieutenant Leslie Snyder,

14   Augusta County Sheriff's Office.

15          THE COURT:  Thank you.  Go ahead, counsel.

16                L E S L I E   S N Y D E R

17    A witness, after first being duly sworn, testified as

18                        follows:

19                  DIRECT EXAMINATION

20   BY MS. PORT:

21      Q.   And Lieutenant Snyder, what is your job title?

22   What are you lieutenant over at the sheriff's office?

23      A.   I'm the administrative lieutenant.  I oversee

24   the decibel meter, FOIA's, expungements, media

25   relations, IVR reporting.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

```
 1        Q.    Fun.  Let's just talk about the decibel meter.

 2        A.    Okay.

 3        Q.    How many does the Augusta County Sheriff's

 4   Office have?

 5        A.    One.

 6        Q.    Fancy.  All right.  Are you responsible for

 7   making sure that decibel meter is calibrated?

 8        A.    Yes, ma'am.

 9        Q.    Were you responsible for making sure that

10   meter had been recently calibrated in June of 2021?

11        A.    Yes, ma'am.

12        Q.    Did you do so?

13        A.    Yes, ma'am.

14        Q.    Do you have with you a copy of the calibration

15   certificate from that time frame and can I show you the

16   calibration certificate from the clerk's office?

17        A.    Yes.

18              MS. MATHENY-WILLARD:  Your Honor, we don't

19   have any objection to the calibration certificate.

20              THE COURT:  I'm sorry.  I didn't hear?

21              MS. MATHENY-WILLARD:  We don't have any

22   objection to the calibration certificate.

23              THE COURT:  Thank you.

24              MS. PORT:  Would the Court like to review

25   those?
```

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1          THE COURT:  All right.

2          MS. MATHENY-WILLARD:  Yes, your Honor.

3   BY MS. PORT:

4      Q.   Lieutenant Snyder, I've just handed you a

5   stack of photographs.  Can you tell me whether those

6   photographs are of the Augusta County Sheriff's Office

7   one decibel meter?

8      A.   Yes, ma'am.

9          MS. PORT:  Thank you.  And your Honor, I'd

10  like to mark these collectively as Commonwealth's One.

11  I will have another witness tell you the significance of

12  them at that time.

13         MS. MATHENY-WILLARD:  And no objection subject

14  to cross examination.

15         THE COURT:  Okay.  Thank you.  Exhibit One,

16  there are multiple photographs here.  Okay.

17                         (WHEREUPON, the document

18                         referred to as Exhibit No.

19                         #1 was admitted into

20                         evidence.)

21  BY MS. PORT:

22     Q.   And Lieutenant Snyder, is this decibel meter

23  the only one that was used by Augusta County Sheriff's

24  Office deputies in order to enforce the noise ordinance

25  in June and July of 2021?

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1        A.   Yes, ma'am.

2        Q.   I don't have any additional questions for you.

3   Ms. Matheny-Willard is going to ask you some now.

4             MS. MATHENY-WILLARD:  I don't have any

5   questions.

6             THE COURT:  Thank you.  You may be excused.  I

7   think you have more cases, so not totally excused.

8   Excused for this case.

9             MS. PORT:  Deputy Clymore.

10            THE COURT:  Good morning, sir.  Come up and

11  have a seat.  Would you raise your right hand?  Do you

12  solemnly swear the evidence you're about to give will be

13  the truth?

14            THE WITNESS:  Yes, your Honor.

15            THE COURT:  If you'll state your name, please?

16            THE WITNESS:  Deputy Dusty Clymore, Augusta

17  County Sheriff's Office.

18            THE COURT:  All right.  Thank you.

19                 D U S T Y   C L Y M O R E

20   A witness, after first being duly sworn, testified as

21                        follows:

22                   DIRECT EXAMINATION

23  BY MS. PORT:

24       Q.   Deputy Clymore, were you working at the

25  Augusta County Sheriff's Office on June 25th of 2021?

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1          A.    Yes, I was.

2          Q.    Did you do any work specifically in the

3    parking lot?

4          A.    Yes.

5          Q.    Sounds like a silly question, but is that

6    parking lot in Augusta County?

7          A.    Yes, it is.

8          Q.    When you were there in the parking lot on June

9    25th of 2021, what were you doing?  What was your job

10   there that day?

11         A.    So, at one point, I had a decibel meter and I

12   went to the edge of our property line with a decibel

13   meter to get a reading.

14              THE COURT:  Where is that, right out here?

15              MS. MATHENY-WILLARD:  Your Honor, I'm going to

16   object to him testifying that's the property line.  I'm

17   not sure who owns that property, but he's not qualified

18   to testify to the property line.

19              MS. PORT:  I do believe he's qualified to

20   testify to the property line.  He can explain how he

21   knows that it is someone else's property at that line.

22   He works there.  He's also a deputy sheriff for the

23   county.

24              MS. MATHENY-WILLARD:  Your Honor, my

25   objection --

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1          THE COURT:  It's an objecton that the only
2     question I have is can the Court take judicial
3     knowledge?  And I think, as I remember, the case law --
4     I may be wrong on this -- they could of boundaries
5     between judicial districts.  But individual streets are
6     not something that I can take judicial notice of.
7          MS. PORT:  Yes, your Honor.  I will then
8     recall Lieutenant Snyder.
9          THE COURT:  Are you finished with this
10    witness?
11         MS. PORT:  I will recall him but I'll
12    establish the property boundaries with the lieutenant
13    from the sheriff's office if the deputy can't do it.
14         THE COURT:  Okay.  You're still on call.  If
15    you will, just do not discuss your testimony until we
16    run you back in here and we excuse you.  Okay.  Virginia
17    is famous on judicial notice.  They won't take notice of
18    a boundary line even though I can look out a window and
19    see it.  But they will say -- they took a great case.  A
20    turkey will disregard boundary lines.  He took judicial
21    notice of it.  That's a court that had zero to do.  Come
22    on up, please.  If you'll raise your right hand.
23    Solemnly swear the evidence you're about to give will be
24    the truth?
25         THE WITNESS:  Yes, sir.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1          THE COURT:  And what is your name, please?

2          THE WITNESS:  Lieutenant Leslie Snyder.

3          THE COURT:  Okay.  Oh, yes, I'm sorry.

4          THE WITNESS:  It's okay.

5          THE COURT:  You're still under oath, okay?

6          THE WITNESS:  Yes, sir.

7      L I E U T E N A N T   L E S L I E   S N Y D E R

8    A witness, after first being duly sworn, testified as

9                     follows:

10                 DIRECT EXAMINATION

11   BY MS. PORT:

12      Q.   And Lieutenant Snyder, tell us where the

13   Augusta County Sheriff's Office is located.

14      A.   127 Lee highway.

15      Q.   So that's not attached to this building, is

16   it?  I'm asking some silly questions.  It's not attached

17   to this court building, is it?

18      A.   No, it's not attached to this court building.

19   It's in Verona.

20      Q.   It's in Verona.  Right now we're in Staunton

21   City.

22      A.   Yes.

23      Q.   The sheriff's office is on 127 highway, you

24   said?

25      A.   Yes.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1      Q.   And in your capacity as part of the

2  administration of the sheriff's office, are you aware of

3  where the sheriff's office property begins and ends?

4            MS. MATHENY-WILLARD:  Your Honor, I'm

5  objecting.  I don't know whether she knows or not, but

6  she's not able to -- the specific question is whether

7  she knows the property line.

8            THE COURT:  You know, I think I'm going to

9  allow this because it's not crucial.  Where this

10  happens, it's very important when you look at time,

11  place, and matter.  So I'm going to allow it.

12            MS. MATHENY-WILLARD:  So, the statute says it

13  has to be measured from the property line.

14            THE COURT:  Oh, I agree.  I agree.  You're a

15  good lawyer but eventually I'm going to have to

16  determine the place.  That's one of the considerations

17  I'll have to make.

18            MS. PORT:  Yes, your Honor.

19            MS. MATHENY-WILLARD:  Yes, sir.

20            THE WITNESS:  I have no idea.

21  BY MS. PORT:

22      Q.   Who would be?

23      A.   Probably the sheriff.

24      Q.   All right.  Thank you, ma'am.  I don't have

25  any other questions.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1        THE COURT:  Any cross?

2        MS. MATHENY-WILLARD:  No.

3        THE COURT:  Thank you very much.

4        THE WITNESS:  Yes, sir.

5        THE COURT:  May she be excused?

6        MS. PORT:  No, not yet.

7        THE COURT:  No objection?

8        MS. MATHENY-WILLARD:  No objection.

9        THE COURT:  All right.  You're excused.  Oh,

10   she's got the other cases.

11        MS. PORT:  Yes, she'll be back.

12        THE COURT:  Thank you.  That was helpful.

13   Your next witness?

14        MS. PORT:  Sheriff Smith.

15        THE BAILIFF:  Might be just a minute.  He's

16   upstairs.

17        THE COURT:  Okay.  That's fine.

18        MS. PORT:  And your Honor, I do see that we

19   have a court reporter.  May I also have permission to

20   record the proceedings?

21        THE COURT:  Pardon me?

22        MS. PORT:  I see we have a court reporter, but

23   may I also have permission to record the proceedings so

24   that I have my own copy?

25        THE COURT:  Sure.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1          MS. PORT:  Thank you, your Honor.

2          THE COURT:  You're right to ask that.

3          MS. PORT:  Yes, sir.

4          THE COURT:  Because unless you have

5   permission, you can't record in a court room.

6          MS. PORT:  Yes, sir.

7          MS. MATHENY-WILLARD:  Your Honor, before she

8   questions the witness, can I have a few minutes?  I

9   think there's a document that I submitted.  Did the

10  clerk's office give you a motion this morning; a copy of

11  a motion in opposition to the recusal?

12         THE COURT:  I didn't get it, but I --

13         MS. MATHENY-WILLARD:  Oh, no.  If you have it,

14  I wanted to take a look at it.

15         THE COURT:  Oh, okay.  Could you give it to

16  her?

17         MS. MATHENY-WILLARD:  Did they bring it to you

18  this morning?

19         THE COURT:  Yeah, I got one to substitute you

20  as counsel, which I entered.

21         MS. MATHENY-WILLARD:  That's the only thing

22  you got this morning?  Okay.  Give me one second.  All

23  right.  I will just ask the questions if I need -- oh,

24  wait.

25         THE COURT:  Let's go ahead and cross

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    examine --

2              MS. MATHENY-WILLARD:  I wanted to voir dire

3    him first.

4              THE COURT:  Pardon me?

5              MS. MATHENY-WILLARD:  I wanted to voir dire

6    him.  I can explain to the Court.

7              THE COURT:  No, I won't allow that.  This is

8    not a jury trial.  We're going to go ahead and hear

9    testimony and you'll cross examine.  And I'll try to

10   give you as much latitude as I can.

11             MS. MATHENY-WILLARD:  I appreciate that.

12             THE COURT:  All right.  Have I sworn him?

13   Solemnly swear the evidence you're about to give will be

14   the truth?

15             THE WITNESS:  I do.

16             THE COURT:  Thank you very much.  Go ahead.

17                   D O N A L D   S M I T H

18    A witness, after first being duly sworn, testified as

19                          follows:

20                   DIRECT EXAMINATION

21   BY MS. PORT:

22      Q.   State your name and occupation, please.

23      A.   Donald Smith.  I'm the sheriff for Augusta

24   County.

25      Q.   And for how long have you been the sheriff for

1    Augusta County?

2         A.   Was elected in November of 2015.

3         Q.   And as the sheriff of Augusta County, are you

4    familiar with the property boundary lines of your

5    sheriff's office?

6         A.   Yes.

7              THE COURT:  We've already been through that, I

8    think, haven't we?  Go ahead.

9              MS. MATHENY-WILLARD:  Your Honor, he said yes

10   but the objection, just to be clear, is that he would

11   not know where the exact boundary line is because he

12   works in the sheriff's office.  The owner would know

13   where the boundary line is.  Maybe the city, someone

14   from the city or the county, that can determine that.

15             THE COURT:  I'll overrule that objection for

16   purposes here and allow his testimony.  Go ahead.

17             MS. PORT:  Yes, Your Honor.

18   BY MS. PORT:

19        Q.   First of all, tell us where the sheriff's

20   office is.

21        A.   127 Lee Highway.

22        Q.   That's here in Augusta County, right?

23        A.   Yes, ma'am, in Verona.

24        Q.   And Lee highway, what direction does that

25   highway run?  East/West, North/South?

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1        A.    North/South.

2        Q.    The parking lot, is it parallel to Lee

3   Highway?

4        A.    Yes, ma'am.  We actually have a parking lot

5   that goes in a horseshoe around the building.

6        Q.    Yes, sir.

7        A.    So we have the main parking lot up front.  We

8   have a side parking lot to the north of the building

9   where the employees park, the deputies park.  And then

10  on the south side of the building, there's a parking lot

11  where other law enforcement agencies use, and some of

12  the public use, on the south side.

13       Q.    The main public parking lot, which one is

14  that?

15       A.    That is on the front side of the building.  It

16  runs parallel to Route 11.

17       Q.    So between the sheriff's office building and

18  Route 11?

19       A.    Yes, ma'am.

20       Q.    I'm going to specifically ask you about the

21  north and south boundaries of the Augusta County

22  Sheriff's Office property.

23       A.    The north boundary is the employee parking

24  lot, and the parking lot runs up to the -- there's a car

25  dealership that's north of us.  And the parking lot runs

1    up to there that it's asphalt and gravel that

2    differentiates.  And then at the northwest corner,

3    there's a grass kind of island that we maintain, we mow,

4    and it runs right up to end of where the property

5    begins.  On the south side, the parking lot on the south

6    side of the building runs to the main road.  There's a

7    road that goes to the government center.  So our parking

8    lot runs right to the road.

9         Q.   So there's actually a road on the south side

10    that separates properties?

11         A.   It separates -- it's my parking lot, the road,

12    and then the Fashion Gallery.

13         Q.   Fashion Gallery is the business on the other

14    side?

15         A.   Yes.

16         Q.   And on the north side, you said the business

17    that's on the other side of your property line was car

18    dealership?

19         A.   Yes, ma'am.

20         Q.   And does the car dealership occupy that space

21    with cars lined up?

22         A.   Yes.

23         Q.   Are the cars lined up on your property or

24    theirs?

25         A.   Their property.  Well, they don't have any

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    vehicle on it.

2        Q.    And Sheriff, those are the only questions I

3    have for you.   Defense attorney can ask you some

4    questions now.

5                        CROSS EXAMINATION

6    BY MS. MATHENY-WILLARD:

7        Q.    Have you ever lied to a federal investigator

8    on a federal case?

9        A.    No, ma'am.

10       Q.    You have not?

11             MS. MATHENY-WILLARD:   And I did locate what I

12   was looking for, Your Honor.   If I could just have one

13   second.

14             THE COURT:   Take your time.

15   BY MS. MATHENY-WILLARD:

16       Q.    Okay.   Are you familiar with Federal Agent

17   Tammy Ketchum?

18             MS. PORT:   And Your Honor, at this time, I

19   would object to any conversation about incidents outside

20   of what we're here to discuss today.   Defense counsel

21   has asked the sheriff a question that I think, on its

22   own, is a question she can ask for impeachment purposes.

23   At this point, she appears to be going towards the

24   extrinsic evidence route.

25             THE COURT:   I'm going to sustain the objection

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    because it goes to maybe his credibility.

2              MS. MATHENY-WILLARD:  Absolutely.

3              THE COURT:  He has not testified to anything

4    but what he thinks is boundaries.  And don't see how

5    this relates to his credibility on that issue.  We'll

6    see where we go with this but that's my ruling.

7              MS. MATHENY-WILLARD:  Your Honor, I understand

8    the Court's ruling.  I just want the the Court to be

9    aware, in response to the objection, it would've been

10   rebuttal evidence based on what he said.  The property

11   line is something that's extremely important based on

12   the ordinance.  So even just testifying to that, if I

13   can establish --

14             THE COURT:  This is impeachment of that.  I

15   appreciate your argument but I'm going to overrule you.

16   All right.  Go ahead.

17             MS. PORT:  I had no additional questions for

18   this witness.

19             MS. MATHENY-WILLARD:  Okay.  I had

20   additional -- yes.

21             THE COURT:  Okay.  Go ahead.

22   BY MS. MATHENY-WILLARD:

23        Q.   Have you ever seen a surveyor come out to the

24   property?

25        A.   Actually, they've surveyed the property

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    several times trying to locate -- we have what they

2    think is an active spring underneath the building.

3    They're getting ready to put a trench around the

4    building.  But as far as me interacting with the

5    surveyor or having any contact with them, no.

6         Q.   So you have not talked to the surveyor

7    regarding where the property line is?

8         A.   Yeah.  I've showed -- I've talked to them and

9    explained to them the same thing that I just told the

10   Court.

11        Q.   So you just said you didn't have any

12   conversations with the surveyor.

13        A.   No, I've had conversations with the Court, or

14   with the surveyors, but what I'm telling you is --

15        Q.   Wait.  Let me let me just clarify.  Did you

16   have conversations with the surveyor or did you not have

17   conversations?

18        A.   I've had conversations with the folks that

19   were doing the work, yes.  But as far as the property

20   lines go, I have told them, you know, where the

21   property, you know, what I just explained.

22        Q.   You told them where you think the property

23   line is.

24        A.   Correct.

25        Q.   But you have not talked to the surveyors about

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

```
1    their assessment of where the property line is?

2         A.   No, ma'am.

3              MS. MATHENY-WILLARD:  Okay.  I don't have any

4    further questions.

5              THE COURT:  Okay.  Anything further?

6              MS. PORT:  No, your Honor, not from this

7    witness at this time.

8              THE COURT:  You're excused.

9              THE WITNESS:  Thank you, sir.

10             THE COURT:  You might be subject to recall.

11             MS. PORT:  I'll re-call Deputy Clymore.

12             THE COURT:  Okay.  And we've heard from him

13   previously.

14             MS. PORT:  Yes, Your Honor.

15             THE COURT:  You're still under oath and you

16   can answer counsel's questions.

17             D E P U T Y   D U S T Y   C L Y M O R E

18   A witness, after previously being duly sworn, testified

19                        as follows:

20                   DIRECT EXAMINATION

21   BY MS. PORT:

22        Q.   Deputy Clymore, I was previously asking you

23   about June 25th, and you mentioned that you had a

24   decibel meter.  Without any reference to the property

25   lines, can you tell us where, in layman's terms, where
```

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    you went with the decibel meter?

2         A.   I went outside the building.  If you're

3    looking at the building to the left to a gravel parking

4    lot, on the other side of a big RV camper.

5         Q.   And is that camper one that belongs to the

6    sheriff's office?

7         A.   No, it belongs to a used car lot.

8              THE COURT:  It belongs to what?

9              THE WITNESS:  A used car lot.

10   BY MS. PORT:

11        Q.   Was it on the used car lot?

12        A.   Yes, it was.

13        Q.   And is that the used car lot that's

14   immediately adjacent next to the sheriff's office?

15        A.   Yes.

16        Q.   Okay.  When you went there with the decibel

17   meter, what did you do?

18             MS. MATHENY-WILLARD:  I'm going to object at

19   this point.  It sounds like he said that he was on the

20   used car lot property.  So if that's where he was, then

21   I'm objecting to relevance to the rest of that.  If

22   that's my understanding.

23             THE COURT:  Lay a foundation with that, ma'am.

24             MS. PORT:  Yes, your Honor.

25   BY MS. PORT:

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1      Q.   And of course you don't technically know who

2  owns the property, right?

3      A.   No.

4          MS. MATHENY-WILLARD:  Again, objection.

5  Basically she's testifying for him.  He said that it was

6  the used car lot's property.

7          THE COURT:  I don't think -- it's questionable

8  it's a leading question.  I believe an evidentiary

9  objection -- I don't think it's necessarily a leading

10 question.  So I've overruled your objection.  But let's

11 get to, you know, what he knows.

12         MS. PORT:  Yes, your Honor.

13 BY MS. PORT:

14     Q.   Describe it the best you can.  Just describe

15 the surroundings without reference to ownership of the

16 property, if you could.

17     A.    Okay.  So it's a gravel parking lot that has

18 a bunch of vehicles for sale in the parking lot.

19     Q.   And in order to get to that parking lot, where

20 did you walk from the sheriff's office?

21     A.   Walked outside our front door, through our

22 paved parking lot, and into a gravel parking lot.

23         MS. PORT:  And your Honor, at this point, I

24 would like to ask him what he did while he was there.

25 Sheriff Smith testified and described the path to get to

1    the car dealership next to the sheriff's office.  I

2    believe this witness has accurately described walking to

3    the place that Sheriff Smith described.

4             THE COURT:  Ask your questions.

5             MS. PORT:  Yes, your Honor.

6             THE COURT:  And I don't want to discourage

7    your objection.

8             MS. MATHENY-WILLARD:  I'll just have this as a

9    running objection based on his testimony.  It's a

10   relevance objection to it based on where he was saying

11   he was.

12            THE COURT:  Okay.  I understand that and I've

13   overruled it.  I may change my mind.  Go ahead.

14   BY Ms. PORT:

15       Q.   So while you were standing in that gravel lot

16   with the vehicles that were for sale, what did you do?

17       A.   I had the decibel meter in my hand and I took

18   the readings.

19       Q.   And as you were taking the readings, were you

20   looking at any specific individuals who were doing some

21   specific thing?

22       A.   Well, I was on the other side of the camper at

23   the time.  And I knew a couple of them had the

24   megaphones.  So at the point at that time, we were just

25   getting the readings with the megaphones.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1      Q.   And you said a couple of them had the

2   megaphones.  Who were you able to identify as the

3   individuals holding the megaphone?

4      A.   At that point, I couldn't identify anybody

5   because I was on the other side of the camper.  So then

6   once I got it from that location, I went to another

7   location and I saw female and a white male and then a

8   black male with the megaphones.  Because they were

9   yelling at me when I walked in front of the sheriff's

10  office to another location.  And they said, "F your

11  decibel meter" and all that kind of stuff.  They used

12  that other language, but --

13     Q.   And are you specifically describing those

14  three; the female, a white male, and a black male?

15     A.   Yes.

16     Q.   Okay.  And were they saying those things just

17  using their voices?

18     A.   No, using the megaphone.

19     Q.   Describe how you know that the meter readings

20  you obtained related to those three individuals?

21     A.   Because when I started walking back from that

22  lot from the other side of the camper, they're the ones

23  that had the megaphones.  When I first got it and walked

24  outside, they were using the megaphones and they were

25  using the whole time.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1      Q.   And as you were obtaining the readings, what

2   were you listening for as you were obtaining the

3   readings?

4      A.   I just had it and listening to what they were

5   yelling.  The deputies were rolling in.  They were like,

6   "take your badge off and all this stuff".  So I was

7   getting that as they were pulling into the parking lot

8   and everything.  And they were saying, excuse my

9   language, but "fuck your decibel meter" and all that

10   kind of stuff.

11      Q.   Were you obtaining readings of all noises in

12   your vicinity?

13      A.   Yes.  It's a continuous reading.

14      Q.   Okay, it's a continuous reading.  When you

15   chose to, say, lock in a reading, what sounds were you

16   hearing at the time you would lock in a reading?

17      A.   The megaphones.  Because there was cars going

18   by but it was not picking those up.  But you could tell

19   it picked it up.  Because when cars were going by, it

20   was lower.  But then when they would start shouting, it

21   was going from 84, anywhere from 84, to like 95/96.

22   Because I was getting pictures on my cell phone with

23   those readings.

24         MS. PORT:  And your Honor, may I retrieve

25   Commonwealth's One, the stack of photographs?

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1        THE COURT:  Yes.

2   BY MS. PORT:

3        Q.   Deputy Clymore, what are the photographs that

4   I just handed you?

5        A.   Readings from my cell phone.

6        Q.   And those are photographs you took?

7        A.   Yes.

8        Q.   And are all those photographs of the decibel

9   readings that you just described when it was taken when

10  the megaphones were sounding?

11       A.   Yes.

12            MS. PORT:  And your Honor, at this time, I'd

13  move to enter these into evidence as Commonwealth's One.

14            THE COURT:  They've already been admitted.

15            MS. PORT:  Yes, your Honor.  Then I'd ask that

16  our record of sorts reflect that the witness has

17  identified Commonwealth's One as his photographs.

18            THE COURT:  All right.

19  BY MS. PORT:

20       Q.   And Deputy Clymore, you described three

21  individuals.  I want to ask specifically about the white

22  male.  Did you identify the individuals at some point?

23       A.   At one point, after I got the decibel meter's

24  readings, I went back inside and got a ticket book.  And

25  he still -- because I identified him.  And then I went

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    back inside and got a summons book and came back outside

2    and he still had the megaphone in his hand.  And at that

3    point, I wrote him a ticket for violation of the noise

4    ordinance.

5         Q.   And that white male, who was that white male?

6         A.   I got his i.d. because he still had the

7    megaphone, and it was Michael Phelps.  Or Phillips,

8    sorry.

9         Q.   Michael Phillips.  And do you see him in the

10   courtroom today?

11        A.   Yes.  But it's over -- I don't know if he's

12   here or not because it was over a year ago and I'm not

13   one hundred percent sure.  Because I have not seen

14   pictures of him lately.  Sorry.

15        Q.   No problem.  I appreciate your honesty,

16   Deputy.  And at this time, I don't have any additional

17   questions with respect to this defendant.

18             THE COURT:  Cross?

19             MS. MATHENY-WILLARD:  Your Honor, I do have

20   cross examination.  I was going to make a motion to

21   dismiss with regard to the identification.

22             THE COURT:  No, cross.  I don't mind the

23   motion but this is not the time.

24             MS. MATHENY-WILLARD:  All right.

25                       CROSS EXAMINATION

1    BY MS. MATHENY-WILLARD:

2       Q.   Okay.  So when you said that you were holding

3    the decibel meter, you said that you went to the gravel

4    parking lot?

5       A.   Yes.

6       Q.   And that's the used car parking lot; is that

7    correct?

8       A.   Correct.

9       Q.   Okay.  So at that point, you were on the other

10   side of the sheriff's department.

11      A.   Correct.

12      Q.   You indicated that there was a white male, a

13   white female, and black male?

14      A.   Yes.

15      Q.   And they were all using the megaphones yelling

16   at you?

17      A.   Yes.  Or yelling at anybody.  Like the

18   deputies that came in.  They yelled at me, told me, like

19   I said, excuse my language, "fuck your decibel meter."

20      Q.   When you did the decibel reading, they were

21   all yelling at you through the megaphones, correct?

22      A.   Yelling at me and deputies coming in and

23   everything, but they did not come close to me.  They

24   stayed over where they were yelling at everybody in the

25   centralized location.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1      Q.   Okay.  So it was like voices on top of each

2   other.  They were just yelling?

3      A.   Yes, with the megaphone, yes.

4      Q.   I know you said you didn't want to say what

5   they were saying specifically, but I need you to say

6   specifically what you remember; the statements that you

7   remember.

8      A.   Okay.  So let me look at my -- one of them

9   said, "fuck your decibel meter."  He didn't care about

10   my "fucking decibel meter".  I could shove my decibel

11   where I wanted to and "take your badge off.  We don't

12   care about your badge" and "fuck the police" and all

13   that stuff.  Then they started counting one, two, three,

14   four, five, six, seven, eight, nine, ten, F twelve.

15   They started saying all that kind of stuff.  And then,

16   "when I say Donald Smith, you say pedophile".  And so

17   they would say Donald Smith or Sheriff Smith in the

18   megaphone and everybody else would chant pedophile.  All

19   sorts of stuff.

20      Q.   Anything else you remember?

21      A.   Not that I can remember, no.

22      Q.   Okay.  So do you remember how long they had

23   been there before this date?  Before the June 25th date,

24   how they how long they had been protesting

25   approximately?

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1        A.    Not exactly.

2        Q.    But at least a month?  I mean, it wasn't a

3   day, right?

4        A.    No, it wasn't a day.

5        Q.    They'd been there for a while.

6        A.    Been there for a while, yes.

7        Q.    So at least maybe one or two weeks.  Was it

8   about 30 days?

9        A.    I can't recall how long they were out there.

10        Q.    Do you know if it was longer than a week?

11        A.    Probably, yes.

12        Q.    Longer than two weeks?

13        A.    I don't know how long exactly they were --

14   they were there for a while, yes.

15        Q.    They were out there for a while before these

16   arrests started?

17        A.    Yes.

18             THE COURT:  I'm going to ask a question.  You

19   object, and I'll sustain your objection.  Was this in

20   the same area that you described earlier in the parking

21   lot?

22             THE WITNESS:  Yes.

23             THE COURT:  Okay.  Go ahead.  Any further

24   questions?

25             MS. MATHENY-WILLARD:  I do, your Honor.  I had

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    one follow up right after that, but let me --

2              THE COURT:  Take your time.

3              MS. MATHENY-WILLARD:  I think that's it.

4              THE COURT:  Any further questions?  Any

5    redirect?

6              MS. PORT:  No, your Honor.

7              THE COURT:  Okay.  You may stand down.

8              MS. PORT:  And your Honor, my next witness

9    will be Warren Cash.  And I'll ask if we could have just

10   a moment to hook up the video that Mr. cash can

11   authenticate hopefully.

12             THE COURT:  Is this your last witness?

13             MS. PORT:  Yes, your Honor.  For this case,

14   yes, sir.

15             THE COURT:  Sir, can I help you?

16             THE BAILIFF:  Mr. Cash, you can come over and

17   sit right here.

18             THE COURT:  Raise your right hand.  Solemnly

19   swear the evidence you're about to give will be the

20   truth?

21             THE WITNESS:  I do, sir.

22             THE COURT:  Thank you.  I didn't realize you'd

23   been called.

24             MS. PORT:  I'm going to have to use the video

25   since we can't use the -- we had previously used the

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    screen but I'm being told now that I can't.

2             THE COURT:  Can counsel approach the bench and

3    you too, sir, and look at this.  And why don't I come

4    down too so we don't have to aim it in two different

5    directions.

6             MS. PORT:  Can you see that, Mr. Cash?  This

7    right here;  this screen.  Can you see that, sir?

8             THE WITNESS:  Yes, ma'am.

9             THE COURT:  Can we all see?

10            MS. PORT:  Yes, sir.  I'm going to move out of

11   the way.

12            THE COURT:  Is this a witness to authenticate?

13            MS. PORT:  Yes, your Honor.

14            THE COURT:  Do you agree?

15            MS. MATHENY-WILLARD:  You're authenticating

16   the video?

17            MS. PORT:  Yes, ma'am.

18            MS. MATHENY-WILLARD:  I don't need it to be

19   authenticated.

20            THE COURT:  Okay.  You can be excused.

21   There's no need to --

22            MS. PORT:  Thank you.

23            THE COURT:  No problem.  It's okay.  This is

24   your last?

25            MS. PORT:  Yes, your Honor.

1          THE COURT:  Okay.  It's all right.  Now, can

2     everybody see?  Huddle up if you can't.

3          MS. PORT:  I've seen it so I'll step back and

4     allow everyone to get closer.  And your Honor, this

5     video is approximately an hour long.  I'm asking to only

6     play the portion that describes the events of this

7     particular citation.

8          THE COURT:  Bless you.  Bless you.

9          MS. PORT:  Yes, your Honor.  It is still a

10    bit.  It starts at four minutes and 16 seconds.

11                              (WHEREUPON, a video

12                              recording was played.)

13          THE COURT:  Does this give the gist of it?

14          MS. PORT:  This video -- if you look in the

15    background of the video, you'll see who is using the

16    megaphones.  Now if the Court has the gist of it and has

17    seen individuals with megaphones, I can --

18          THE COURT:  Half an hour of that is --

19          MS. PORT:  Correct.

20          THE COURT:  I've got the idea.

21          MS. PORT:  Correct, your Honor.  What I aim to

22    show you is the defendant's identity.

23          MS. MATHENY-WILLARD:  She has not established

24    that, your Honor.

25          THE COURT:  We'll come back to that.

1          MS. PORT:  Yes, your Honor.  Thank you, sir.

2          THE COURT:  Thank you all for your patience.

3     All right.  The Commonwealth rests?

4          MS. PORT:  Yes, your Honor.

5          THE COURT:  I don't need to hear argument.

6          MS. MATHENY-WILLARD:  Okay.

7          THE COURT:  The Supreme Court of the United

8     States in the Clark case, I think it was like in 1984,

9     decided that for judges in order to protect the first

10    amendment had to look at the government's interest in

11    determining whether the first amendment has been

12    violated.  And the Court ruled that you look at the

13    time, the place, and the matter.  And that has been the

14    law.  Like or not, it's been the law.  And the one thing

15    you can't look at is the content.  Now, you can in

16    certain instances look at content.  But vulgar,

17    discourteous, hateful language is what we bought into

18    when we passed the Bill of Rights First Amendment.  And

19    I have to, as Judge, make sure that this is -- now this

20    is the words of the Clark case -- narrowly tailored to

21    this bringing process is to serve the significant

22    government interest.

23          I believe in the first amendment.  I dislike a

24    lot of stuff I hear here in the court.  And I personally

25    am offended, but that doesn't matter.  I'm here as

Judge. I'm here to protect that constitution for everybody in this room, no matter what their views are.

I heard the language. I listened to some of it. It's reprehensible. But that's why we live in this country. That's why we have this Bill of Rights. So not getting to the identification, that's why I wanted to take this up first. Okay, counsel.

MS. PORT: Yes, your Honor.

THE COURT: And it has been a pleasure, Ms. Port. And your brief was about as good on this issue as you could make, but you're not going to win it, I don't think, in any court. I'm going to dismiss these two warrants. That's why we're not worried about your information. You now come back to the person. You are now again Michael Phillips and we've identified you. And I'm going to find him not guilty by reason of a violation of the first amendment. The Commonwealth may have a right to appeal this. That statute is unclear to me. The legislators mess that up. I don't know the answer. But it doesn't matter. I do what I think is right on it. And thank you for your patience.

I'm not going to comment on the content of your speech either. That's not my place. Okay. All right. He's free to go.

MS. MATHENY-WILLARD: I'm assuming that

1  applies to all of them.  Do you want them all to come

2  up?

3         THE COURT:  This is only in the parking lot

4  cases that I find this.  Other cases, I may come to a

5  different result.  I don't know.  I have to hear them

6  first.

7         MS. MATHENY-WILLARD:  Okay.

8         THE COURT:  But these are all the people of

9  similar.  You and the Commonwealth maybe can agree on

10  who these people are.  The Commonwealth, I appreciate

11  your good spirits in this.  I know it's a very hard

12  thing.  You've worked very hard.  But I'm very secure in

13  feeling like this is not appropriate of the first

14  amendment.

15         MS. PORT:  Yes, Your Honor.  I will go through

16  and identify them.

17         THE COURT:  I've got to go through them too.

18  I don't have a clerk here.

19         MS. MATHENY-WILLARD:  Oh, you're looking for

20  your clerk.

21         THE COURT:  Yeah, I need the clerk to give me

22  the warrants.  Could you go through and as the names are

23  called --

24         THE BAILIFF:  We have them all filed right

25  here.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

```
 1            THE COURT:  Oh, you do.  Okay.  Good.  All
 2     right.  We'll call them up.  If your case is called,
 3     please come up.
 4            MS. PORT:  The next defendant has some cases
 5     that are similar, and I believe some that are different.
 6     So Cameron Turley is the next one on my list.  We can
 7     identify the ones that are similar.
 8            THE COURT:  Okay.  Well, if there are
 9     non-similar cases, we'll wait.
10            MS. PORT:  Okay.  Sure.  McKenzie McQueary.
11            MS. MATHENY-WILLARD:  And your Honor, while we
12     call her up, this is one of the corrections on the
13     docket.
14            THE COURT:  Okay.  Let me say hello to Ms.
15     McQueary.  How are you?
16            MS. MCQUEARY:  I'm good.  How are you?
17            THE COURT:  All right.  These are the same
18     charges and I assume she pleads not guilty.
19            MS. MATHENY-WILLARD:  Correct, your Honor.
20            THE COURT:  All right.  Counsel, did you want
21     to --
22            MS. MATHENY-WILLARD:  Yes.  Just on the charge
23     that ends in 7027, the docket has McQuanry.  So it's
24     just the M-C-Q-U-E-A-R-Y is the spelling of her last
25     name on that 7027.
```

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

```
 1              THE COURT:  Last name and then first name?
 2              MS. MATHENY-WILLARD:  McKenzie is correct.
 3              THE COURT:  Okay.  McKenzie is correct.
 4              MS. MATHENY-WILLARD:  McQueary is wrong.  It
 5     has an N instead of an A.
 6              THE COURT:   Oh, it has an A.  Okay.
 7              MS. MATHENY-WILLARD:  Yes.
 8              THE COURT:  I'll make that correction.
 9              MS. MATHENY-WILLARD:  Okay.  So do you want me
10     to just let her know that her case is going to be
11     dismissed?
12              THE COURT:  Yes.  Do you want to be heard on
13     this, counsel?
14              MS. PORT:  On the name change?
15              THE COURT:  No, no, that's all right.  It
16     doesn't matter.  Actually, I was an attorney once.  Do
17     you have anything on this case?
18              MS. PORT:  Oh, I'll submit this to the Court,
19     your Honor.
20              THE COURT:  Okay.  Again, did you hear what I
21     said on the other about the first amendment?
22              MS. MCQUEARY:  Yes.
23              THE COURT:  Same applies to you and I'm going
24     to find you not guilty of these charges.  Okay?
25              MS. MATHENY-WILLARD:  Thanks, your Honor.
```

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

```
 1              MS. MCQUEARY:  Thank you.
 2              MS. PORT:  So just to be clear, we dismissed
 3   two for McKenzie McQueary and two for Michael Phillips.
 4              THE COURT:  One second.  I've just got to
 5   catch up with the paperwork.
 6              MS. PORT:  Yes, your Honor.  Absolutely.
 7              THE COURT:  Be patient with me.  All right.
 8   These are all done.  I'm giving them back to you.  All
 9   right.
10              MS. PORT:  Mr. Ismael Barrios.
11              THE COURT:  All right.
12              MS. MATHENY-WILLARD:  And the plea is not
13   guilty.
14              THE COURT:  Mr. Barrios, all right.  Is this
15   the same deal?
16              MS. PORT:  Yes, your Honor.  These would be
17   factually similar.
18              THE COURT:  I don't encourage it, but does
19   either counsel have anything to say?
20              MS. PORT:  No, your Honor.
21              MS. MATHENY-WILLARD:  No, your Honor.  His
22   plea is not guilty of course.
23              THE COURT:  Do you understand what I've said?
24   Do you have any questions?
25              MR. BARRIOS:  No.
```

1          THE COURT:  I will find you not guilty.  I

2     won't comment on your conduct because that's not my

3     place.

4          MS. MATHENY-WILLARD:  Thanks, your Honor.

5          MS. PORT:  Cortez Nathan.

6          MS. MATHENY-WILLARD:  And there's a spelling

7     question on this one.

8          THE COURT:  Okay.  One second.  Let me get the

9     one over here.  How are you, sir?

10         MR. NATHAN:  How are you, your Honor?

11         THE COURT:  Very well, thank you.  And he has,

12    what, three charges?

13         MS. PORT:  I only have two.  I could be

14    missing one.

15         THE COURT:  Disorderly conduct charge?

16         MS. PORT:  The disorderly would be a separate

17    incident.

18         THE COURT:  I have two noise ordinances.

19         MS. MATHENY-WILLARD:  And he'll remain for the

20    disorderly and cursing abuse.

21         THE COURT:  Pardon me?

22         MS. MATHENY-WILLARD:  He will remain for

23    the -- no, I'm sorry.  That's Cameron.  Hang on one

24    second.

25         THE COURT:  I'm sorry.  When you speak down,

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    it's not you.  It's me.

2           MS. MATHENY-WILLARD:  I was thinking she was

3    talking about Cameron's charges.  But for Cortez, yes, I

4    just have two.

5           MS. PORT:  And then I did find --

6           THE COURT:  We have a noise and disorderly

7    conduct charge.

8           MS. PORT:  And the disorderly is a separate

9    incident.

10          THE COURT:  We'll try that separately.

11          MS. PORT:  Yes, your Honor, thank you.

12          THE COURT:  However, I will dismiss the two

13   noise ordinances as I have in the other cases.  You'll

14   have to remain.  You have a third charge.  I'll get to

15   it when we can.

16          MR. NATHAN:  Thank you, your Honor.

17          MS. MATHENY-WILLARD:  Thanks, your Honor.  And

18   I'm sorry, for one of the noise ordinance, there is a

19   name correction if you want to make that.

20          THE COURT:  Yeah, I do.

21          MS. MATHENY-WILLARD:  On 7442, the court has

22   Cotez, C-O-T-E-Z.  It should just be Cortez on 7442.

23          THE COURT:  Actually, yeah.  Okay.  I will

24   make them -- thank you very much.

25          MS. MATHENY-WILLARD:  You're welcome, your

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    Honor.

2              THE COURT:  It's very helpful for you to do

3    that, Ms. Matheny-Willard.  Okay.  I'll keep this one in

4    tow, okay?

5              MS. PORT:  Yes, your Honor.  Ms. Bonnie

6    Chapman has two charges that are both the same facts;

7    parking lot megaphone.

8              THE COURT:  Could you tell the bailiff the

9    name again?

10             MS. PORT:  Bonnie Chapman.

11             THE COURT:  Good morning.  Thank you.  She

12   pleads not guilty, I assume?

13             MS. MATHENY-WILLARD:  Not guilty, yes, on

14   both, your Honor.

15             THE COURT:  Do you want to be heard on either?

16             MS. PORT:  No, your Honor.  Thank you.

17             THE COURT:  You might like to be heard but you

18   know it's a waste of your time.  Let me say to you like

19   I like to say to everybody.  Y'all have been here

20   several times and it's been a long process for you, but

21   it's important we try these cases one way or the other.

22   I may be wrong but it's important.  But I think you're

23   not (inaudible).

24             MS. PORT:  Thank you, your Honor.

25             MS. MATHENY-WILLARD:  Thanks, your Honor.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

```
 1              MS. PORT:  Anthwhon Suiter.

 2              THE COURT:  Are you Mr. Suiter?

 3              MR. SUITER:  Yes, your Honor.

 4              MS. MATHENY-WILLARD:  Two not guilty pleas,

 5    your Honor.

 6              THE COURT:  Same situation, counsel?

 7              MS. PORT:  Yes, your Honor.  These are both

 8    similar facts; megaphone use in the parking lot.

 9              THE COURT:  Okay.  Mr. Suiter, did you hear

10    what I said in the other cases?

11              MR. SUITER:  I did.

12              THE COURT:  I will find you not guilty of

13    these two charges.

14              MS. MATHENY-WILLARD:  Thanks, your Honor.

15              THE COURT:  All right.

16              MS. PORT:  And the remaining defendants do

17    have some that are separate but some that are similar.

18    So Mr. Stephen Nelson.

19              THE COURT:  Okay.

20              MS. MATHENY-WILLARD:  Technically, your Honor.

21    Chris Okay didn't substitute out so he's on the docket

22    as his attorney.  So we just left it like that.

23              THE COURT:  All right.  Sir, are you a member

24    of the Virginia Bar?

25              MR. OKAY:  Yes, your Honor.
```

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

```
1              THE COURT:  Thank you.
2              MR. OKAY:  Yes, your Honor.
3              THE COURT:  I have to ask it.
4              MR. OKAY:  I don't blame you.
5              THE COURT:  All right.  Let's see.  We have
6    two noise violations and a disorderly conduct.
7    Disorderly conduct will be set aside and we'll take care
8    of the noise ordinances charges.  Do you understand
9    that?
10             MR. NELSON:  Yes, sir.
11             THE COURT:  Okay.  You have to remain because
12   we're going to try the disorderly conduct.  How does the
13   defendant plea?
14             MR. OKAY:  He's not guilty, your Honor, of all
15   charges.
16             THE COURT:  Well, right now, there are two
17   charges.
18             MR. OKAY:  Yes, sir, your Honor.
19             THE COURT:  All right.  I'm going to find him
20   not guilty and you heard the reason why, haven't you?
21             MR. NELSON:  Yes, sir.
22             MR. OKAY?  Thank you, your Honor.
23             MS. PORT:  Mr. Dylan Jorgensen.
24             THE COURT:  Good morning.
25             MR. JORGENSEN:  Good morning, Judge.
```

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1          THE COURT:  How are you?

2          MR. JORGENSEN:  Good.  How are you?

3          THE COURT:  I'm okay.

4          MS. MATHENY-WILLARD:  He's pleading not

5     guilty.  There is a name correction spelling.

6          THE COURT:  Let me see here.  He has a

7     disorder conduct and I'll set that aside.  He does have

8     one excessive -- just one charge, right?

9          MS. MATHENY-WILLARD:  That's correct.  And

10    that's where the name correction is.

11         THE COURT:  Okay.  What is the correction?

12         MS. MATHENY-WILLARD:  Dylan, on your docket,

13    you have D-I-L-L-I-O-N.  It's D-Y-L-A-N for his first

14    name.

15         THE COURT:  D-I-L-L?

16         MS. MATHENY-WILLARD:  No, I think that's what

17    you have.  His correct spelling is D-Y.

18         THE COURT:  I see.  On the disorder conduct,

19    it's different.

20         MS. MATHENY-WILLARD:  Yeah.  On the disorderly

21    conduct, it's correct.

22         THE COURT:  Oh, that's correct.

23         MS. MATHENY-WILLARD:  And then on the

24    exceeding max sound, it's not correct.

25         THE COURT:  Thank you for your patience.

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    You're getting used to my hearing, I think.  Thank you,

2    counsel.  All right.  On the excessive noise, he will be

3    found not guilty by reason of the first amendment.   And

4    that's that.  Do you have any questions?

5              MR. JORGENSEN:  No.  Thank you.

6              THE COURT:  You have to remain.

7              MS. PORT:  And the last defendant, I believe,

8    is Cameron Turley.

9              THE COURT:  All right.  We have a noise

10   ordinance charge here and I think I entered an order

11   that you represent him.

12             MS. MATHENY-WILLARD:  Yes.

13             THE COURT:  He pleads not guilty, I assume?

14             MS. MATHENY-WILLARD:  He pleads not guilty,

15   your Honor.

16             THE COURT:  I will find you not guilty.  Did

17   you hear?

18             MR. TURLEY:  Yes.

19             THE COURT:  Okay, good.  Again, thank you for

20   your patience.

21             MS. MATHENY-WILLARD:  And he has two.

22             THE COURT:  He has to remain.  No, he has just

23   two noise?

24             MS. MATHENY-WILLARD:  No, he does have

25   disorderly.  I just wanted to make sure you've got it.

1    THE COURT:  All right.  You have to remain for

2  the disorderly.

3    MS. MATHENY-WILLARD:  Thanks, your Honor.

4    THE COURT:  Okay.  The next one?

5    MS. PORT:  And I believe that is all of them,

6  your Honor, for the noise violations.

7    THE COURT:  If anybody is in court on the

8  noise ordinance and I haven't tried you, please raise

9  your hand.  Okay.

10    MS. MATHENY-WILLARD:  Your Honor, I would like

11  to ask for just a --

12    THE COURT:  A recess?

13    MS. MATHENY-WILLARD:  -- a five minute break

14  to just regroup.

15    THE COURT:  Yeah, y'all have been very good.

16  Absolutely.

17    MS. PORT:  And before we do that, with all due

18  respect, if the Court could just note the Commonwealth's

19  objection to the Court's ruling.

20    THE COURT:  Absolutely.  I understand it.  And

21  your brief is really good.

22    MS. PORT:  Thank you, your Honor.

23    THE COURT:  It was no lack of good lawyer.

24  It's just lack of constitutional law.

25    MS. MATHENY-WILLARD:  And your Honor, I would

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1    ask that the witnesses remain until we figure out who

2    we're going to call.

3              THE COURT:  All right.  You want them to be

4    here?

5              MS. MATHENY-WILLARD:  No, they can be where

6    they are.  I just don't want them to leave the building.

7              THE COURT:  Let's take about a 10 minute

8    break.  It is now 10:15.  Let's be back in here by 10:30

9    so you'll have time to do what you want.

10             MS. MATHENY-WILLARD:  Thank you, sir.

11             MS. PORT:  Thank you, your Honor.

12

13                        (WHEREUPON, the above styled

14                         proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

COMMONWEALTH OF VIRGINIA, v. CAMERON TURLEY, et al,

1                    REPORTER'S CERTIFICATE

2

3     COMMONWEALTH OF VIRGINIA

4     COUNTY OF AUGUSTA, to-wit:

5

6           I, the undersigned, Notary Public in and for

7     the Commonwealth of Virginia, at large, do hereby

8     certify that the foregoing is, to the best of my skill

9     and ability, a true and accurate transcript of

10    proceedings had and evidence adduced at a hearing held

11    in the above-styled case, on SEPTEMBER 2ND, 2022.

12

13                         /S/ LAURA B. BALLENGEE, CER

14

15           My commission expires SEPTEMBER 30TH, 2024.

16           Registration No. 352644.

17

18

19

20

21

22

23

24

25

IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

UNITED STATES OF AMERICA          )
                                  )
        v.                        )
                                  )        Court No. 5:14-cr-00055
MARIA ROSALBA ALVARADO-MCTAGUE    )
*et al.*                          )

## AFFIDAVIT OF SPECIAL AGENT TAMI KETCHAM

I hereby swear and affirm as follows:

1.      I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations.  I am one of the lead agents for the above-captioned case and have been heavily involved in the investigation of this case.

2.      On December 12, 2014, law enforcement executed search warrants at the home of Maria Rosalba Alvarado ("Alvarado") and Felix Chujoy ("F. Chujoy"), located at 469 Eastover Drive; at Alvarado's rental home at 452 Cardinal Drive; and at the restaurant, Inca's Secret, all in Harrisonburg, Virginia.

3.      After the indictment of Alvarado and F. Chujoy in December 2014, law enforcement and a federal grand jury continued to investigate the defendants for labor trafficking and other charges.

4.      On March 18, 2015, law enforcement executed search warrants at the home of Alvarado at 469 Eastover Drive and at the apartment of Gladys Chujoy ("G. Chujoy") located at 1014 Blue Ridge Drive, both in Harrisonburg, Virginia.

1

5.      After indictment of Alvarado, F. Chujoy, and G. Chujoy by a federal grand jury in March 2015, law enforcement continued to investigate the three individuals, as well as prepare for trial in the above-captioned case, including interviewing various witnesses.

6.      Based on prior witness statements and cellphone records, law enforcement involved in this case believe that Alvarado and F. Chujoy tampered with witnesses, in part, by borrowing the telephones and cellphones of their friends and communicating with the witnesses in this manner to hide their communications from law enforcement.   Agents have interviewed individuals closely associated with the defendants, whose cellphone numbers appear in the call detail records of government witnesses, such as Donald Smith, Carolyn Edlind, Yuri Jung, and Michael ("Mike") Kwiatkowski.

7.      In particular, on May 21, 2015, after prior attempts to do so, Special Agent Anthony Woodard and I interviewed Carolyn Edlind and, at the conclusion of the interview, served her with a subpoena to testify at trial in the above-captioned case.   Among other statements, in her interview, Edlind stated that Alvarado's accountant was bad but did not mention that she heard this information from Alvarado and F. Chujoy after their December 2014 arrest, or that she had discussed this information with any other witnesses.   During the interview, we also extensively questioned Edlind about her knowledge of Inca's Secret and its former employees.   Edlind mentioned that she would provide minimal help at the restaurant on occasion. During the interview, Edlind stated that she never discussed immigration issues with Alvarado or others, except a conversation with Alvarado when the restaurant opened in 2007 where Alvarado acknowledged that the legal status of the workers.

8.      On May 27, 2015, Special Agent David Liu and I interviewed Deputy Donald Smith, who is a sworn Deputy Sheriff with Augusta County and was recently elected sheriff.   On

2

June 10, 2015, Special Agent Woodard and I served Deputy Smith with a subpoena to testify at trial in matter and asked him additional questions.

9.     I have subpoenaed Deputy Smith to testify at the June 22, 2015, October 26, 2015, and December 1, 2015 trials. My understanding from Deputy Smith is that he has not been subpoenaed by any other party.

10.     During the interviews with Edlind and Smith (and other witnesses), another agent or I took handwritten notes during and/or after the interviews.

11.     Prior to the June 2015 trial date, I contact both Edlind and Smith and asked if they would meet with Assistant United States Attorney Heather Carlton so that she could help prepare them for trial in this matter. Both individuals refused at the United States Attorney's Office.

12.     During the investigation in this case, I interviewed Leonel Fuentes, who is the accountant for Alvarado and/or Inca's Secret. I have also served a subpoena for records on Mr. Fuentes and have obtained files from him.

13.     On August 25, 2015, at the invitation of his counsel and in the presence of his counsel, AUSA Carlton and I interviewed an individual incarcerated at the Rockingham County Jail. During the interview, the inmate indicated that the inmate and others had loaned F. Chujoy their PIN numbers, so that F. Chujoy could place telephone calls from the jail under their names when he was incarcerated there from March to June 2015. From prior investigations and other sources, I understand that inmates will loan each other their PIN numbers in order to avoid detection of those calls by law enforcement, knowing that telephone calls are recorded and logged by an inmate's PIN number.

14.     Based on this information, I requested from the Rockingham County Jail copies of any recorded telephone calls placed to the telephone numbers of certain government witnesses

3

in the above-captioned case.  In response, the Rockingham County Jail provided copies of eleven recorded telephone calls a several days later.  I have reviewed each of those telephone calls on multiple occasions.   Of those eleven calls, nine calls are copies of recorded telephone conversations between F. Chujoy and Deputy Smith that occurred from May to June 2015, as follows:

        a.  In a call dated May 10, 2015, Smith agreed to pay bills for F. Chujoy.  F. Chujoy asked if Smith had received a letter from him and asked for his advice based on what was contained in the letter.  The advice appears to be related to F. Chujoy's criminal case.

        b.  In a call dated May 29, 2015, Smith told F. Chujoy that "they came after me this week".  F. Chujoy asked what was said during the interview.  Smith relayed some of the content of his interview with federal agents to F. Chujoy.  F. Chujoy states that he will write Smith, but for Smith not to write F. Chujoy.

        c.  In a call dated June 2, 2015, F. Chujoy asked Smith to contact a witness and have the witness come by the jail to see him this weekend.  F. Chujoy tells Smith that Mike is the reason federal agents called Smith and that he wanted Smith to know.  F. Chujoy told Smith to contact Mike if Smith wanted to know more.

        d.  In a call dated June 5, 2015, F. Chujoy asked if Smith received his letter, which Smith confirmed that he had.  Smith indicated that he did not get the letter about Mike.  Smith asked if he needed to go talk to Mike.  F. Chujoy told Smith to see Mike after he received F. Chujoy's letter and after Smith spoke to F. Chujoy's "aunt," because F. Chujoy put more details into his letter to his aunt.  F. Chujoy stated that Mike has the wrong information and that Mike did not understand when F. Chujoy was joking.  F. Chujoy wanted Smith to clarify this with Mike.  Smith stated that he had not heard from Mike, Christina, or Yuri.  Smith told F. Chujoy

<div align="center">4</div>

that the federal agents had asked him about "all of that stuff and he said he did not have a clue." F. Chujoy was surprised Smith talked to federal agents because Smith had told him he was not going to talk to them. Smith said he did not tell them anything and that he did not say certain things. Smith relayed to F. Chujoy that he had checked on G. Chujoy at his request. F. Chujoy asked Smith to "clarify" with Mike or get him to "come into town."

e. In a call dated June 8, 2015, F. Chujoy wanted to know if Smith had spoken to G. Chujoy and "what she was telling him." F. Chujoy asked Smith to reach out to Yuri. F. Chujoy asked if he had heard from anyone else.

f. In a call dated June 13, 2015, F. Chujoy asked if Smith had received his letter. Smith told F. Chujoy he had been subpoenaed to come to court. Smith stated that they wanted to know who at Christmas time was using his cellphone, and Smith said he did not know. Smith said they wanted to know if he speaks Spanish and who used his cellphone.

g. In a call dated June 14, 2015, Smith stated that he had not received a letter from F. Chujoy yet. F. Chujoy stated that, in addition to the letter, he wants Smith to remember that F. Chujoy used to text and call everyone from everyone's cellphone because he had a crappy phone and could barely hear. Smith told F. Chujoy that he had already said they took his cellphone. F. Chujoy stated that it was hard to text on that cellphone.

h. In a call dated June 16, 2015, F. Chujoy asked Smith if he had received the letter.

i. In a call dated June 20, 2015, F. Chujoy asked Smith if he had received the letter.

15. One call is a recorded telephone call between Defendant F. Chujoy and Yuri Jung. Jung is a friend of F. Chujoy and has been repeatedly subpoenaed by the United States to testify at trial in the above-captioned case.

16.     Edlind did not mention any jail calls with F. Chujoy or letters to/from F. Chujoy during my interview with her in May 2015. Smith stated that he received one telephone call from F. Chujoy in March 2015 about picking up his mail, but did not mention any other telephone calls or any jail letters to/from F. Chujoy at either of his interviews in May and June 2015.

17.     In September 2015, I served both Smith and Edlind with subpoenas to testify before a federal grand jury about potential witness tampering by F. Chujoy.

18.     On October 6, 2015, Smith and Edlind testified before a federal grand jury.

19.     On October 20, 2015, I testified before the same federal grand jury as Edlind and Smith on October 6. I testified regarding jail calls, text messages, recorded conversations, and other physical evidence obtained before and during the grand jury investigation into potential witness tampering by F. Chujoy.


I affirm that the above statements are true.


_____, HSI  SA          11/23/2015
Special Agent Tami Ketcham                  Date


6