CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

November 19, 2024
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **SAMUEL JOSEPH ORLANDO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 5:22-cv-062** |
| | ) | |
| **v.** | ) | **By:  Michael F. Urbanski** |
| | ) | **Senior United States District Judge** |
| **SHERIFF DONALD L. SMITH, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION</u>**

In this civil rights action brought under 42 U.S.C. § 1983, plaintiff Samuel Orlando alleges that Donald Smith, Sheriff of Augusta County, and Major Brian Jenkins, an employee of the Augusta County Sheriff's Office, obtained and executed a search warrant in violation of the First and Fourth Amendments of the United State Constitution. Orlando also alleges that Smith and Jenkins conspired with Rebecca Neal and Bristol Neal ("the Neals") to violate the Fourth Amendment. Orlando raises other common law and Virginia statutory causes of action against Smith, Jenkins, and the Neals.

Smith and Jenkins filed a motion to dismiss challenging the sufficiency of Orlando's allegations. After considering the briefing and oral argument on the motion to dismiss, the court concludes that Orlando's Fourth Amendment claims, Counts I, II, and VIII, must be dismissed. The motion to dismiss will be denied as to Count III, Orlando's First Amendment retaliation claim. This memorandum opinion also addresses Orlando's state law claims, Counts VII, X, XI, XII, XIII, and XIV, which are all dismissed. Orlando's claims against the Neals

alone, Counts IV, V, VI, and IX, were severed from this case and are proceeding in a separate

lawsuit. Order, ECF No. 40; see also Orlando v. Neal et al., No. 5:23-cv-012.

# I.

Orlando alleges that he has been an outspoken critic of Smith's conduct as Augusta

County Sheriff, and Orlando's claims concern various ways in which Smith and Jenkins are

alleged to have retaliated against him. Compl., ECF No. 1, ¶¶ 29-56. Orlando claims to be the

victim of sexual abuse at the hands of Bristol Neal and that the Augusta County Sheriff

declined to investigate Orlando's complaints against Bristol Neal. Id. ¶¶ 57-78, 127-33.

Instead, Orlando claims that Smith and Jenkins, acting on complaints lodged by the Neals that

Bristol Neal had been sexually abused by Orlando's guardians, Richard Moore and Micheal

Donovan, applied for and obtained search warrants from a state magistrate authorizing

searches of 47 South Windsong Court, the house where Orlando resided with his guardians,

and of 113 Mill Place Parkway, the commercial complex housing the offices of Nexus

Commercial Ventures LLC, a business affiliated with Moore and Donovan. Id. ¶¶ 79-81, 167.

The warrants specifically sought evidence, such as computer files, video surveillance footage,

and sex toys, relating to a violation of Virginia Code § 18.2-370.1: "Taking indecent liberties

with child by person in custodial or supervisory relationship." 47 South Windsong Court

Search Warrant, ECF No. 108-1 at 1, 3; 113 Mill Place Parkway Search Warrant, ECF No.1-

8, at 1.[1]

---

[1] In ruling on a motion to dismiss, the court may consider documents intrinsic to the complaint. The court may "consider documents that are explicitly incorporated into the complaint by reference, and those attached to the complaint as exhibits." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) and Fed. R. Civ. P. 10(c)). The court may also rely on "pertinent documents that a plaintiff fails to attach to the complaint if a defendant has attached them to a motion to dismiss, especially if a plaintiff has referred to the document in the complaint . . . without converting

Orlando claims that the Fourth Amendment was violated in two respects. In Count I, Orlando claims that he was unconstitutionally seized because he was handcuffed for several hours during the search at 47 South Windsong Court.[2] Compl., ECF No. 1, ¶¶ 184-86. In Count II, Orlando claims that the search warrant affidavit authored by Jenkins was constitutionally deficient because it contained a materially false statement of Orlando's age relative to that of Bristol Neal, despite Smith allegedly knowing Orlando's actual age. Id. ¶¶ 193-94.

In Count III, Orlando alleges that during the search, "[t]he deputies seized large quantities of protest materials, seizures that can only be described as motivated by animus toward the political messaging of the materials." Id. ¶ 200. Orlando claims that this seizure of materials beyond the scope of the warrant was retaliation against him for protected First Amendment activity. Id. ¶ 199.

Counts IV, V, VI, and IX, containing allegations of sexual misconduct solely against the Neals, are unrelated to the search warrant at issue in this case and have been severed from this action to proceed as a separate lawsuit. Order, ECF No. 40.

---

the motion to dismiss into a motion for summary judgment." Hoffman v. Daimler Trucks N. Am., LLC, 940 F. Supp. 2d 347, 354 (W.D. Va. 2013) (citing Davis v. George Mason Univ., 395 F. Supp. 2d 331, 335 (E.D. Va. 2005), aff'd, 193 F. App'x 248 (4th Cir. 2006), and 5A Charles A. Wright & Arthur P. Miller, Federal Practice and Procedure § 1327 (3d ed. 2012)). However, the court may only do so if "the document was integral to the complaint and there is no dispute about the document's authenticity." Goines, 822 F.3d at 166 (citing Sec'y of State for Defence v. Trimble Nav. Ltd., 484 F.3d 700, 705 (4th Cir. 2007); Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004); and Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999)).

[2] Orlando alleges that "[d]uring the execution of the Warrant, deputies from Defendant SHERIFF SMITH's office removed Plaintiff SAMUEL ORLANDO from the Residence, secured him with handcuffs, and kept him sitting in the back of a police car in the Residence's cul-de-sac for more than five (5) hours." Compl., ECF No. 1, ¶ 180. Alternatively, paragraph 186 alleges that "[t]he Sheriff's office deputies kept Plaintiff SAMUEL ORLANDO hand-cuffed for more than four (4) hours." Id. ¶ 186.

In Count VII, Orlando seeks actual damages pursuant to Virginia Code § 9.1-135 arising out of Jenkins' filing of the Affidavit for Search Warrant, alleging that the affidavit contains "juvenile delinquency investigative and hearing information," Compl., ECF No. 1, ¶ 228, and that Smith and Jenkins "knew or should have known that the juvenile records were protected and were not permitted to be disclosed." Id. ¶ 229.

Count VIII alleges a §1983 conspiracy by Smith, Jenkins, and the Neals to violate the Fourth Amendment by searching 47 South Windsong Court and 113 Mill Place Parkway, "which led to the seizure of Plaintiff SAMUEL ORLANDO's personal property without probable cause (i.e., based on false pretenses)." Id. ¶¶ 236, 240.

Count X alleges intentional infliction of emotional distress against Smith and the Neals, alleging that they "intended to create a false affidavit to support a criminal investigation of Plaintiff SAMUEL ORLANDO, which began with the creation of the Affidavit that led to the Warrant." Id. ¶ 250. Count XI alleges negligent infliction of emotional distress against Smith, Jenkins, and the Neals for participating in the criminal investigation without "sufficiently investigat[ing] the allegations" that Bristol Neal, not Orlando, was the victim of sexual abuse. Id. ¶ 258.

Count XII contains a stand-alone claim for punitive damages against Smith for his "pursuit of unfounded criminal charges and a potential criminal investigation of Plaintiff SAMUEL ORLANDO in retribution for Plaintiff SAMEUL ORLANDO's protected exercise of his First Amendment rights." Id. ¶ 265.

In Count XIII, Orlando alleges that Smith committed defamation per se when he "published the Affidavit supporting the Warrant with local news organizations in Virginia,"

id. ¶ 267, either knowing that the allegations of sexual abuse by Orlando were false or recklessly disregarding the truth or falsity of the allegations, id. ¶¶ 268-84.

Finally, Count XIV alleges a civil conspiracy under Virginia Code §§ 18.2-499 and 500 against Smith and Jenkins, asserting that they "conspired together to mutually benefit the parties," and in so doing, "lied about the age of Plaintiff SAMUEL ORLANDO, a juvenile sex assault victim, and publicly identified that juvenile victim as an alleged child molester." Id. ¶¶ 287-88.

## II.

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." Id. at 679; see also Simmons v. United Mortg. & Loan Inv., 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.") (internal quotations and emphasis omitted).

A court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia Found. v. Nat'l Sec. Agency, 857

F.3d 193, 208 (4th Cir. 2017). Nevertheless, a court is not required to accept as true "a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286 (1986); conclusory allegations devoid of any reference to actual events, United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979); or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences," Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks omitted).

## III.

Section 1983 is "a vehicle for vindicating preexisting constitutional and statutory rights." Safar v. Tingle, 859 F.3d 241, 245 (4th Cir. 2017). The statute provides that a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.

To prevail on a claim for a civil rights violation under Section 1983, a plaintiff must establish (1) that he has been deprived of a right, privilege or immunity secured by the Constitution or laws of the United States and (2) that the conduct about which he complains was committed by a person acting under color of state law. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 658 (4th Cir. 1998).

The doctrine of qualified immunity affords protection against Section 1983 liability to officials insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Stated another way, "[q]ualified immunity protects officials 'who commit constitutional violations but who, in light

of clearly established law, could reasonably believe that their actions were lawful.'" Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 537-38 (4th Cir. 2107) (citing Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). The doctrine weighs the need to hold public officials accountable for irresponsible exercise of power against the need to shield officials from harassment, distraction, and liability when they perform their duties responsibly. Booker, 855 F.3d at 538 (citing Pearson, 555 U.S at 231).

In performing a qualified immunity analysis, a court must first determine the specific right under federal law that the plaintiff alleges was infringed by the challenged conduct. Id. (citing Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc)). The court then must ask whether a violation of that right occurred and, if so, whether, at the time of the violation, the right at issue was clearly established. Id. The questions need not be asked in a particular order. Id. (citing Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 353 (4th Cir. 2010), and Pearson, 555 U.S. at 236). In this circuit, the plaintiff bears the burden of showing that a constitutional violation occurred, while the defendant bears the burden of showing entitlement to qualified immunity. Henry v. Purnell, 501 F.3d 374, 377 (4th Cir. 2007).

## IV.

In Count I, Orlando alleges that the Fourth Amendment was violated because he was handcuffed outside his 47 South Windsong Court residence for more than four hours "during

7

the search." Compl, ECF No. 1, ¶ 185.[3] Specifically, Orlando alleges that his handcuffing

constituted an "unreasonable detention." Id. ¶ 189.[4]

The Fourth Amendment protects the right to be free from unreasonable seizures. Unus

v. Kane, 565 F.3d 103, 119 (4th Cir. 2009). However, "[t]he test of reasonableness under the

Fourth Amendment is not capable of precise definition or mechanical application." Bell v.

Wolfish, 441 U.S. 520, 559 (1979). As the Supreme Court explained in Graham v. Connor,

assessing reasonableness is an objective inquiry that "requires careful attention to the facts and

circumstances of each particular case." 490 U.S. 386, 396 (1989). For example, in Graham

itself, the Court required the lower court to apply the objective reasonableness standard in a

case examining whether police had used excessive force by handcuffing a plaintiff whom they

refused to help even as he attempted to explain that he was diabetic and needed assistance. Id.

Graham established factors guiding the reasonableness inquiry in the excessive force context,

including the severity of the crime at issue, whether a suspect poses an immediate threat, and

whether a suspect is attempting to evade arrest by flight. Id.

In Michigan v. Summers, the Court considered Fourth Amendment reasonableness in

the distinct context of detaining an occupant of the premises to be searched during a search.

452 U.S. 692, 705 (1981). The Court held that "a warrant to search for contraband founded

---

[3] Elsewhere in the complaint, Orlando alleges that he was handcuffed for more than five hours "[d]uring the execution of the Warrant." Compl., ECF No. 1, ¶ 180.

[4] Handcuffing sometimes gives rise to excessive force claims as well as unreasonable detention claims. Both types of claims are evaluated under an objective reasonableness standard, Unus v. Kane, 565 F.3d 103, 120 (4th Cir. 2009), though some courts have concluded that "detention in tight handcuffs does not amount to excessive force without a showing of significant physical harm." Pair v. Burroughs, No. 3:15-cv-776, 2016 WL 7197389, at *7-8 (E.D. Va. Dec. 9, 2016); see also Deavers v. Vasquez, 57 F. Supp. 3d 599, 608 (E.D. Va. 2014) (granting summary judgment because the plaintiff failed to show significant physical injury where only claims were that handcuffing caused bruising and aggravated existing rotator cuff injuries); Cooper v. City of Virginia Beach, 817 F. Supp. 1310, 1319 (E.D. Va. 1993), aff'd, 21 F.3d 421 (4th Cir. 1994) (granting summary judgment to defendants where plaintiff offered no allegations or proof of lasting injuries caused by handcuffing).

on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Id. The Court also considered other factors justifying detention during the execution of a search warrant, such as the legitimate law enforcement interest in preventing flight, minimizing the risk of harm to the officers executing the search, and the orderly facilitation of the search. Id. at 701-04. Although the Court in Summers found the detention there to be reasonable, the Court noted that "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case." Id. at 705 n.21.

In Muehler v. Mena, the Court merged the insights of Graham and Summers to uphold the use of handcuffs to detain a resident of the premises being searched pursuant to a warrant, explaining:

> Inherent in Summers' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention. See [Graham, 490 U.S. at] 396 ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it"). Indeed, Summers itself stressed that the risk of harm to officers and occupants is minimized "if the officers routinely exercise unquestioned command of the situation." 452 U.S. at 703.

544 U.S. 93, 98-99 (2005). The Court also rejected Mena's argument that the duration of the handcuffing was constitutionally unreasonable, concluding as follows:

> The duration of a detention can, of course, affect the balance of interests under Graham. However, the 2- to 3-hour detention in handcuffs in this case does not outweigh the government's continuing safety interests. As we have noted, this case involved the detention of four detainees by two officers during the search of a gang house for dangerous weapons. We conclude that the detention of Mena in handcuffs during the search was reasonable.

Id. at 100. Thus, Summers authorizes officers to detain occupants of the premises to be searched during the search. And Mena authorizes officers to use reasonable force, including handcuffs, to effectuation the detention—at least for a period of several hours where safety interests are at stake.

Following Summers and Mena, the Fourth Circuit had occasion to address the use of handcuffs during the execution of a search warrant in Unus v. Kane. 565 F.3d at 103. Unus concerned the execution of a search warrant seeking financial records, not the dangerous weapons or persons involved in Mena. Id. at 119 n. 22. However, the Fourth Circuit found the decision to initially handcuff plaintiffs reasonable based on "legitimate safety concerns," as the agents were searching a "residence believed to contain evidence of money laundering by entities suspected of assisting international terrorism." Id. at 120. The court explained that "[v]iewed objectively, the agents did not know whether they would be confronted by resistance" and agents indeed "encountered hectic conditions." Id.  Moreover, the Fourth Circuit concluded that, in part because the case was "'terrorism-related'" and agents reported that plaintiffs had behaved strangely at the time of entry, "it was not unreasonable for the federal agent defendants to keep the plaintiffs detained in handcuffs for nearly four hours." Id.

Thus, under Fourth Circuit precedent, a handcuffed detention of approximately four hours is constitutionally reasonable where justified based on the circumstances of the search. And circumstances other than allegations of terrorism have been held to justify prolonged detention in handcuffs. For example, in Pair v. Burroughs, a district court in this circuit concluded that officers acted reasonably in handcuffing a suspect where the officers "worried

that [the suspect] could use a remote device to delate the electronically stored information sought in the search warrant." No. 3:15-cv-776, 2016 WL 7197389, at *8-9 (E.D. Va. Dec. 9, 2016). Preventing the destruction of electronic records may therefore also justify handcuffing an occupant of a residence during a search.

However, although courts have routinely deemed handcuffing for several hours to be reasonable, the Fourth Circuit has "never held that using handcuffs is per se reasonable." E.W. v. Dolgos, 884 F.3d 172, 180 (4th Cir. 2018). As one court put it, "inherent in [Summers and Mena] is the principle that the circumstances and manner of a warrant-based detention matter." Hutchinson v. West Va. State Police, 731 F. Supp. 2d 521, 537, 542-44 (S.D. W. Va. 2010) (denying summary judgment on unreasonable detention claim and concluding that there was a clearly established "right not to be forced to be nude for 30 to 45 minutes, while police officers conduct a warrant-based search of one's home"). For example, in E.W. v. Dolgos, the Fourth Circuit held that a school resource officer's handcuffing of a calm, compliant elementary school student was unreasonable, E.W., 884 F.3d at 184, though the court ultimately concluded that the officer had qualified immunity, id. at 186.

Thus, the question here is whether the particular circumstances alleged give rise to a plausible claim that Orlando's handcuffing for four or five hours was objectively unreasonable. Summers makes it clear that the resident of a home to be searched pursuant to a valid search warrant may be detained, and Graham and Mena authorize the use of handcuffs to minimize the risk of harm to both officers and occupants. Mena and Unus both hold that it was not objectively unreasonable under the facts of those cases to handcuff a resident for the duration of a search for several hours, two to three in Mena and nearly four in Unus. But while Mena

involved a search for guns and <u>Unus</u> involved a search for financial records connected to international terrorism, Orlando alleges "the absence of any threat to the deputies' safety or to the integrity of the search." Compl., ECF No. 1, ¶ 188. Still, there may have been some risk in this case that the electronic records sought would be destroyed during the search, as was the case in <u>Pair v. Burroughs</u>. 2016 WL at *8-9. This case is not like those cases where courts have allowed unreasonable detention claims to proceed, as there are no allegations here that the manner of handcuffing was particularly degrading, <u>Hutchinson</u>, 731 F. Supp. 2d at 44, or unique factors like the age of the detainee or the school setting at issue in <u>E.W.</u>, 884 F.3d at 184.[5] Under these circumstances, Orlando's handcuffing for four to five hours likely was not objectively unreasonable in violation of the Fourth Amendment.

Nevertheless, because the unreasonable detention case law is fact-dependent and this case does not entail the kinds of clear safety concerns at issue in <u>Mena</u> and <u>Unus</u>, the court will consider the second prong of the qualified immunity analysis, which asks whether the right alleged to have been violated was clearly established at the time of the violation. <u>Booker</u>, 855 F.3d at 538. The Supreme Court has explained that a constitutional right is clearly established if "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002). "To determine whether a right is clearly established, [courts typically] assess whether the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." <u>Wilson v. Prince George's Cnty.</u>, 893 F.3d 213, 221 (4th Cir. 2018). When "there are no such decisions from courts of controlling authority, [courts] may look to a

---

[5] Orlando was 19 when the search warrant was executed. Compl., ECF No. 1, ¶¶ 1, 6.

consensus of cases of persuasive authority from other jurisdictions, if such exists." <u>Booker v. S.C. Dep't of Corr.</u>, 855 F.3d 533, 538-39 (4th Cir. 2017). "Either way, these sources must have placed the statutory or constitutional question beyond debate." <u>Sharpe v. Winterville Police Dep't</u>, 59 F.4th 674, 683 (4th Cir. 2023). Although a previous case directly on point is not required, <u>id.</u>, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply," <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 63 (2018).

Here, far from clearly establishing that a four to five-hour detention in handcuffs is unreasonable, Supreme Court and Fourth Circuit authority provides a reasonable officer grounds for reassurance that Orlando's detention under the alleged circumstances was reasonable. <u>Summers</u> authorizes the detention of persons located at a residence to be searched; <u>Mena</u> authorizes the use of handcuffs for a person detained; and <u>Mena</u> and <u>Unus</u> allow officers to employ handcuffs for several hours. Admittedly, Fourth Amendment reasonableness is frequently a fact-specific inquiry, <u>Graham</u>, 490 U.S. at 396, and comparing the warrant here seeking electronic records with the warrant in <u>Mena</u> seeking dangerous weapons, or indeed comparing the sexual abuse alleged here to the money laundering in relation to terrorism at issue in <u>Unus</u>, is an imprecise exercise. However, qualified immunity does not require a case on point negating the existence of a right; the doctrine instead protects against liability except where there is precedent clearly confirming the existence of the right. As such, even if Orlando's detention in handcuffs is considered to be constitutionally unreasonable, qualified immunity shields Smith and Jenkins from Fourth Amendment liability for Orlando's detention in handcuffs as alleged in Count I.

13

**V.**

In Count II, Orlando alleges that Smith and Jenkins lacked probable cause to seek the search warrant because the warrant application incorrectly stated Orlando's and Bristol Neal's relative ages. Compl., ECF No. 1, ¶ 164. Orlando claims that Smith knew his actual age and either deliberately or with reckless disregard for the truth caused Jenkins to make a materially false statement. Id. ¶¶ 193-94.

Generally, there is "a presumption of validity with respect to the affidavit supporting [a] search warrant." Franks v. Delaware, 438 U.S. 154, 171 (1978). However, in Franks, the Supreme Court established that the Warrant Clause of the Fourth Amendment provides limited safeguards for ensuring probable cause is based on a "'truthful showing'"—not in the sense that "every fact recited in the warrant affidavit is necessarily correct," but in the sense that "the information put forth is believed or appropriately accepted by the affiant as true." Id. at 164-65. Specifically, in Franks, the Court held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

Id. at 155-56 (1978). Notably, the safeguards of Franks are limited such that "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." Id. at 171-72.

In the context of claims for civil liability based on dishonest affidavits, the Fourth Circuit applies Franks' requirement that the false statements or omissions be "necessary" to

the "finding of probable cause." <u>Miller v. Prince George's County</u>, 475 F.3d 621, 628 (4th Cir. 2007) (citing <u>Franks</u>, 438 U.S. at 155-56). To determine whether false statements are material to the existence of probable cause, the court should "'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the "corrected" warrant affidavit would establish probable cause.'" <u>Id.</u> (quoting <u>Wilson v. Russo</u>, 212 F.3d 781, 789 (3d Cir. 2000)). "If the 'corrected' warrant affidavit establishes probable cause, no civil liability lies against the officer." <u>Id.</u>

The question here is thus whether the warrant for 47 South Windsong Court would still be rooted in probable cause if the portion containing an alleged falsity as to Orlando's age were excised. On page three of the affidavit, Jenkins recounts some information about the intimate relationship between Orlando and Bristol Neal, stating that "[t]heir relationship occurred in Illinois and Virginia and ended when BN turned 16 and Orlando was about to turn 19." 47 South Windsong Court Search Warrant, ECF No. 108-1 at 10. Orlando alleges that this sentence was materially false in that Jenkins erroneously transposed his age with that of Bristol Neal. Compl., ECF No. 1, ¶ 164. Orlando further alleges that Smith knew Orlando's actual age and, as such, he knew that the portion of the Application for Search Warrant mentioning Orlando and Bristol Neal's relative ages was either deliberately false or the product of reckless disregard for the truth. <u>Id.</u> ¶¶ 192-94. However, even if these allegations demonstrate the requisite "'high degree of awareness of [a statement's] probable falsity,'" <u>Miller</u>, 475 F.3d at 627 (quoting <u>Wilson</u>, 212 F.3d at 788), which is itself less than plausible as it was allegedly Smith who knew Orlando's age but Jenkins who drafted the affidavit, the misstatement of Orlando's age was immaterial to the existence of probable cause.

Jenkins' search warrant affidavit, which begins on the warrant form and continues on for four single spaced pages, contains plentiful support for probable cause unrelated to Orlando or his age.[6] The bulk of Jenkins' affidavit concerns Bristol Neal's allegations that Moore and Donovan molested him while he was a minor. The affidavit states that Bristol Neal's mother "RBN reported that her son, BN, had told her that he was sexually abused in Las Vegas, Nevada by Richard Moore in March of 2018 at the age of 16. The abuse continued in Virginia for one and a half years." 47 South Windsong Court Search Warrant, ECF No. 108-1 at 9. The affidavit continues to provide details from Bristol Neal of the sexual abuse he allegedly encountered from Moore and Donovan at their 47 South Windsong Court residence and elsewhere. Id. at 8-11. In short, while the affidavit may have gotten the relative ages of Bristol Neal and Orlando wrong, that error does nothing to undercut the substantial information in the affidavit about Moore and Donovan's alleged abuse of Bristol Neal. Clearly, even if the information concerning Orlando's age is excised, the affidavit provides probable cause to support issuance of the search warrant. Thus, Orlando has not stated a claim for civil liability under Franks and Miller as to Count II. Because there was plainly no constitutional violation, there is no need to consider qualified immunity.

---

[6] Probable cause "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014). Probable cause "deals with probabilities and depends on the totality of circumstances." Maryland v. Pringle, 540 U.S. 366, 371 (2003). Probable cause "'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" Wesby, 583 U.S. at 57 (quoting Illinois v. Gates, 462 U.S. 213, 243-44 n. 13 (1983)). Probable cause requires more than a bare suspicion, but less than that evidence needed to convict. Spivey v. Norris, 731 F. App'x 171, 175-76 (4th Cir. 2018) (citing United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998)).

## VI.

In Count III, Orlando alleges that Smith and Jenkins retaliated against Orlando for exercising his First Amendment rights by seizing "large quantities of protest materials" during the search of 47 South Windsong Court. Compl., ECF No. 1, ¶ 199. Orlando alleges that this seizure was "motivated by animus toward the political messaging of the materials." Id. ¶ 200.

To state a Section 1983 claim based on First Amendment retaliation, "a plaintiff 'must allege that (1) []he engaged in protected First Amendment activity, (2) the defendant[] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct.'" Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (quoting Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005)).

As to the first prong, Orlando alleges that "criticizing an elected Sheriff accused of criminal activity is Constitutionally protected speech." Compl., ECF No. 1, ¶ 199. The complaint details Orlando's history as a "political, social-justice, and police-accountability activist;" Orlando's political activities have included engaging in protests against the Sheriff's Office, maintaining a "website specifically criticizing [Sheriff Smith]," and litigating several actions against Smith. Id. ¶¶ 29-39. Protests, websites, and other advocacy are unambiguously speech protected by the First Amendment. See Snyder v. Phelps, 562 U.S. 443, 451-52 (2011) (quoting Connick v. Myers, 461 U.S. 138, 145 (1983)) (protecting controversial protest speech and noting that "'speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection'"). Thus, Orlando has plausibly alleged that he engaged in protected First Amendment activity.

As to the second prong, Orlando alleges that Smith and Jenkins took adverse action against his First Amendment rights by seizing his possessions used in his protected speech while executing an unrelated search warrant. The warrant for 47 South Windsong Court sought to recover sex toys and electronic evidence of charges against Moore and Donovan of "taking indecent liberties with [a] child by [a] person in [a] custodial or supervisory relationship." Compl., ECF No. 1, ¶¶ 170-72. However, during the search, Orlando alleges Sheriff Smith's deputies seized "hundreds of lapel stickers . . . opposing the Sheriff's reelection to office," documents and "evidence" of crimes allegedly committed by Smith, "protest flyers," and "body cameras" used by protestors—all belonging to Orlando. Id. ¶¶ 175-79. This seizure meets the definition of adverse action. Adverse action constituting First Amendment retaliation is action that "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." Constantine, 411 F.3d at 500. Here, a "'person of ordinary firmness'" would likely be deterred from exercising their First Amendment rights due to both the embarrassment of their personal property being seized and the message sent by police seizing protest materials in particular. Id.

Defendants argue that Orlando fails the second prong because Orlando's exercise of his First Amendment rights was not in fact chilled. Mem. Supp. Mot. Dismiss, ECF No. 11 at 5 (quoting Compl., ECF No. 1, ¶ 55 (alleging that Orlando "refuses to be further silenced by corrupt law enforcement" and will continue speaking out)). However, "[a] plaintiff's 'actual response to the retaliatory conduct' is not dispositive of the question of whether such action would likely deter a person of ordinary firmness." Martin, 858 F.3d at 250 (quoting Constantine, 411 F.3d at 500). Rather, "[t]he test is an objective one." Garcia v. Montgomery

County, 145 F. Supp. 3d 492, 515 (D. Md. 2015). Although Orlando himself may be undeterred, seizure of protest materials is objectively likely to deter an ordinary person from engaging in future protest activity.

Finally, a First Amendment retaliation plaintiff must plausibly allege that a causal connection exists between their protected First Amendment activity and the adverse action defendants took curtailing their First Amendment rights. Here, several factors support a sufficient causal connection to establish a prima facie claim of Frist Amendment retaliation. First, it is telling that although the broader search of 47 South Windsong Court was conducted pursuant to a warrant based on probable cause, the warrant did not concern protest materials. In First Amendment retaliation cases based on retaliatory prosecutions and arrests, the presence or absence of probable cause is often significant. The Supreme Court has held that the existence of probable cause negates a First Amendment retaliation claim. Nieves v. Bartlett, 587 U.S. 391, 404 (2019) (holding that a retaliatory arrest claim fails if there was probable cause for the arrest); Hartman v. Moore, 547 U.S. 250, 256 (2006) (requiring retaliatory prosecution plaintiffs to prove as a threshold matter that the decision to press charges was unsupported by probable cause). At the same time, the Court has noted that "because probable cause speaks to the objective reasonableness of an arrest, its absence will . . . generally provide weighty evidence that the officer's animus caused the arrest." Nieves, 587 U.S. at 402 (citing Ashcroft v. al-Kidd, 563 U.S. 731, 736 (2011)). It is therefore illuminating here that Orlando's protest materials were seized despite having no connection to the underlying warrant or accompanying affidavit, which, though detailing probable cause justifying a search for evidence of sex crimes, did not contain anything extending probable

cause to the seizure of protest materials. This lack of probable cause lends credence to Orlando's allegations of an alternative, retaliatory motive.

Where "the plaintiff establishes the absence of probable cause," the plaintiff must still "show that the retaliation was a substantial or motivating factor." Nieves, 587 U.S. at 404. Here, the nature of the materials seized provides the requisite additional support for Orlando's allegation that the Sheriff's deputies seized his protest materials in retaliation for his protest activities. The fact that the materials seized were themselves instruments of the underlying First Amendment activity forges an obvious connection. Freeman v. Spoljaric, 667 F. Supp. 3d 636, 663 (S.D. Ohio 2023) (relying on circumstantial evidence of retaliatory motive where police seized a phone used as the instrument of protected First Amendment activity—recording the police). As does the fact that the materials concerned Smith directly.

At the motion to dismiss stage, a Fist Amendment retaliation plaintiff need only make out a prima facie case. Id. After the plaintiff has shown that retaliation was a substantial or motivating factor, the "defendant can prevail . . . by showing that the [adverse action] would have been initiated without respect to retaliation." Nieves, 587 U.S. at 399, 404 (requiring that plaintiff's protected activity "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive"). For example, it may emerge that protest materials were not, in fact, seized, or that defendants had some genuine belief that Orlando's protest activities were within the scope of their investigation. Baribeau v. City of Minneapolis, 596 F.3d 465, 481 (8th Cir. 2010) (affirming summary judgment for defendants where evidence uncovered during discovery indicated that defendants had arrested plaintiffs based on genuine, though "unreasonable," belief that protest conduct violated the

law). However, at this stage, Orlando has stated a plausible prima facie claim of First
Amendment retaliation.

Defendants are not entitled to qualified immunity on this claim because Orlando's right
to be free from retaliation for his criticism of the police was clearly established. Once again,
in determining whether a right was clearly established, the question is "whether it would be
clear to a reasonable officer that his conduct was unlawful in the situation he confronted."
Purnell, 652 F.3d at 534. When evaluating qualified immunity in the context of First
Amendment retaliation claims, the Fourth Circuit has defined the right at issue as the First
Amendment right the plaintiff exercised and for which he was allegedly subject to retaliation.
For example, in Tobey v. Jones, the Fourth Circuit considered a case where a plaintiff alleged
he was arrested in retaliation for displaying the text of the Fourth Amendment on his chest as
he went through airport security. 706 F.3d 379, 384 (4th Cir. 2013). The court decided
defendants were not entitled to qualified immunity by defining the right in question as the
right to "peaceful nondisruptive speech in an airport" which "cannot be suppressed solely
because the government disagrees with it." Id. at 391. Here too, Orlando's right to speak out
against the police without being subject to retaliation is beyond doubt. Similarly, in Trulock v.
Freeh, where a plaintiff alleged that the FBI searched his townhouse and computer in
retaliation for his writing a magazine article criticizing the FBI and other law enforcement, the
Fourth Circuit held that "[i]t is well established that a public official may not misuse his power
to retaliate against an individual for the exercise of a valid constitutional right" and that "the
First Amendment prohibits an officer from retaliating against an individual for speaking
critically of the government." 275 F.3d 391, 405-06 (4th Cir. 2001). Thus, it would have been

clear to a reasonable officer that Orlando's speech criticizing the police was constitutionally protected and that the First Amendment prohibited retaliating against Orlando by seizing his protest materials.

Accordingly, defendants' motion to dismiss Count III must be denied.

## VII.

Orlando's last Section 1983 claim, Count VIII, alleges a conspiracy to deprive Orlando of his Fourth Amendment rights. Compl., ECF No. 1, ¶¶ 232-42. Orlando alleges that Smith "wanted to punish Plaintiff SAMUEL ORLANDO for his political activism" and thus interviewed the Neals, secured the search warrant for 47 South Windsong Court, and executed the search warrant, "which led to the seizure of Plaintiff SAMUEL ORLANDO's personal property without probable cause (i.e., based on false pretenses)." Id. ¶¶ 233, 236, 240.[7]

However, as explained in addressing Count II, there was ample probable cause to search 47 South Windsong Court based on the allegations of sexual abuse against Moore and Donovan described in the search warrant affidavit. Because, objectively, there was probable cause in this case, Orlando's claim that Smith's subjective intent was improperly colored by his desire to "punish" Orlando is irrelevant. Courts "eschew[] inquiries into intent" in the Fourth Amendment context. Ashcroft, 563 U.S. at 738 (refusing to consider the "alleged pretextual use of the warrant" and finding no Fourth Amendment violation where a warrant

---

[7] Count VIII alleges that the search of 47 South Windsong Court was unlawful from conception to execution, unlike Count III, which focuses on the seizure of protest materials. As discussed in regards to Count III, Orlando has plausibly alleged that the seizure of protest materials was beyond the scope of the warrant for 47 South Windsong Court for First Amendment retaliation purposes. However, Orlando only challenges this seizure of his protest materials on First Amendment retaliation grounds and does not appear to challenge the seizure on Fourth Amendment grounds anywhere in the complaint, including in Count VIII. Count VIII would not be an appropriate vehicle for challenging the seizure of Orlando's protest materials because Orlando has not alleged any coordination regarding that seizure.

supported by individualized suspicion justified arrest). The Supreme Court has held that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996). Thus, because Orlando has not alleged a Fourth Amendment violation based on an objective lack of probable cause, there is no need to consider whether there has been a conspiracy to violate the Fourth Amendment or delve further into the qualified immunity analysis, and Count VIII is dismissed for failure to state a claim.

## VIII.

Orlando brings five claims against Smith and Jenkins under Virginia law. In Count VII, Orlando alleges that Smith and Jenkins violated Va. Code Ann. § 9.1-135 by including juvenile delinquency investigative and hearing information related to Orlando in the affidavit. Compl., ECF No. 1, ¶ 228. In Count X, Orlando alleges that Smith and Jenkins intentionally inflicted emotional distress on Orlando by creating a false search warrant affidavit. Id. ¶ 250. In Count XI, Orlando contends that Smith, Jenkins, and Rebecca Neal committed negligent infliction of emotional distress in composing the affidavit. Id. ¶¶ 253-61. In Count XIII, Orlando alleges defamation per se resulting from Smith's publication of the affidavit to local news organizations. Id. ¶¶ 267-84. Finally, in Count XIV, Orlando alleges that Smith and Jenkins violated Va. Code Ann. §§ 18.2-499 and 18.2-500 by publishing the affidavit. Id. ¶¶ 285-90.

At the outset, the court notes that Virginia's sovereign immunity doctrine applies to Orlando's state law claims. In Virginia, sovereign immunity protects law enforcement officers from liability except where the officer "acts wantonly, or in a culpable or grossly negligent manner." James v. Jane, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980). Gross negligence is "'the

absence of slight diligence or the want of even scant care.'" Colby v. Boyden, 241 Va. 125,

133, 400 S.E.2d 184, 189 (1991) (quoting Frazier v. City of Norfolk, 234 Va. 388, 393, 362

S.E.2d 688, 691 (1987)). "Willful and wanton negligence is action undertaken in conscious

disregard of another's rights, or with reckless indifference to consequences with the defendant

aware, from his knowledge of existing circumstances and conditions, that his conduct probably

would cause injury to another." Green v. Ingram, 269 Va. 281, 292, 608 S.E.2d 917, 923 (2005)

(quoting Woods v. Mendez, 265 Va. 68, 76-77, 574 S.E.2d 263, 268 (2003)).

　　To determine whether sovereign immunity applies, Virginia courts consider the

following factors set out in James v. Jane:

> [W]e examine the function [the] employee was performing and
> the extent of the state's interest and involvement in that function.
> Whether the act performed involves the use of judgment and
> discretion is a consideration, but it is not always determinative. .
> . . Of equal importance is the degree of control and direction
> exercised by the state over the employee . . . .

221 Va. at 53, 282 S.E.2d at 869. Virginia courts consider law enforcement officers like Smith

and Jenkins to be performing "a government function" requiring "significant judgment and

discretion" under the "administrative control" of their government "employer." Cromartie v.

Billings, 298 Va. 284, 297, 837 S.E.2d 247, 254 (2020). Virginia courts recognize that the

government has a "clear interest in the work" police perform, particularly when they perform

core tasks like the procurement and execution of a search warrant. Id. Accordingly, Virginia

courts apply sovereign immunity to protect police defendants like Smith and Jenkins from

liability for simple negligence.

　　In Count VII, Orlando alleges that the affidavit in support of the search warrant

included "juvenile delinquency investigative and hearing information," which Orlando alleges

violated Va. Code Ann. § 9.1-135. Compl., ECF No. 1, ¶ 228. This statute provides civil remedies for certain statutory violations, including the unlawful dissemination of juvenile record information. See Va. Code Ann. § 19.2-389.1; Gobble v. Va. Dep't of State Police, No. 201503, 2021 WL 5987134, at *5 (Va. Dec. 16, 2021). The provision further states that "[t]his section shall not be construed as a waiver of the defense of sovereign immunity." Va. Code Ann. § 9.1-135(B). Orlando fails to state a claim under Va. Code Ann. § 9.1-135 because the inclusion of Orlando's juvenile record information in an affidavit submitted to the Augusta County Circuit Court in support of a search warrant application does not qualify as an unlawful dissemination. Rather, Smith and Jenkins disclosed this information to the court as part of their law enforcement investigative duties. See Va. Code Ann. § 19.2-389.1 (permitting juvenile record information to be disseminated to Virginia law enforcement for the "purposes of the administration of criminal justice"). Additionally, Orlando has not alleged that Smith or Jenkins acted with gross negligence so as to allow the information in the affidavit to spread beyond its permissible criminal justice use. See Thomas v. Payne, 69 Va. Cir. 51, 52 (Richmond City 2005) (applying sovereign immunity to preclude Va. Code Ann. § 9.1-135 liability for sheriff and other police defendants where plaintiff did not allege "sufficient facts to state a claim of gross negligence"). Accordingly, Count VII is dismissed.

Next, in Count X, Orlando claims that Smith and the Neal defendants intentionally inflicted emotional distress upon Orlando by creating the allegedly inaccurate affidavit identifying Orlando as the aggressor in the alleged sexual abuse between Orlando and Bristol Neal. See Compl., ECF No. 1, ¶¶ 249-50. Orlando further contends that Smith committed the tort of intentional infliction of emotional distress by publishing the affidavit. Id. ¶ 251.

Orlando claims that Smith and the Neals engaged in this conduct despite knowing that the allegations against Orlando were false and that their actions would cause Orlando to suffer severe emotional distress. Id. ¶¶ 249, 252.

To establish a claim for intentional infliction of emotional distress under Virginia law, a plaintiff must show that:

> One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.

Womack v. Eldridge, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974). "[S]ubstantive claims for intentional infliction of emotional distress under Virginia law 'need not be pled [in federal court] with the degree of specificity required by Virginia courts.'" Faulkner v. Dillon, 92 F. Supp. 3d 493, 500 (W.D. Va. 2015) (quoting Nelson v. Green, No. 3:06-cv-070, 2014 WL 131055, at *14 (W.D. Va. Jan. 14, 2014)). However, they must still state a plausible claim under the federal standard. Id.

Orlando's intentional infliction of emotional distress claim against the Neals fails because he has not sufficiently pleaded a causal connection between the Neals' actions and the emotional distress that Orlando alleges. The conduct that purportedly harmed Orlando was Smith's publication of the affidavit. There is no allegation that the Neals were connected to this publication, and Count X is accordingly dismissed as to the Neals.

Orlando's claim against Smith also fails. Although Orlando alleges that Smith was responsible for issuing a press release containing Orlando's juvenile record information, Orlando has not alleged facts elevating this action to the level of outrageous and intolerable conduct. Outrageous and intolerable conduct is conduct "beyond all possible bounds of decency" or conduct that is "utterly intolerable in a civilized community." Harris v. Kreutzer, 271 Va. 188, 204, 624 S.E.2d 24, 34 (2006) (internal quotations omitted) (finding that a doctor verbally abusing a patient was not outrageous). Issuing a press release is not "beyond all possible bounds of decency"—particularly in the absence of further allegations in the complaint about to whom, when, and with what detail the press release was issued. Id. Orlando's allegation that he suffered severe emotional distress is also conclusory. Orlando alleges that he suffered "emotional and mental distress, anguish, humiliation, embarrassment, fright, shock, pain, discomfort, and anxiety." Compl., ECF No. 1, ¶¶ 249, 252. However, to state a claim of intentional infliction of emotional distress, a plaintiff must allege more precise facts indicating emotional distress, such as "objective physical injury caused by the stress" or that the plaintiff "sought medical attention, . . . was confined at home or in a hospital, or . . . lost income." Russo v. White, 241 Va. 23, 28, 400 S.E.2d 160, 163 (1991). Orlando has not plausibly alleged that he suffered emotional harm "so severe that no reasonable person could be expected to endure it." Id. Accordingly, the claim will be dismissed as to Smith as well.

Count XI, Orlando's claim for negligent infliction of emotional distress against Smith, Jenkins, and Rebecca Neal, must also be dismissed. First, sovereign immunity precludes a claim based on simple negligence against Smith and Jenkins. James, 221 Va. at 53, 282 S.E.2d at 869. Orlando alleges that Smith and Jenkins "did not sufficiently investigate" the allegations

against him. Compl., ECF No. 1, ¶ 258. Failing to sufficiently investigate does not rise to the level of gross negligence, so Count XI must be dismissed as to Smith and Jenkins.

Moreover, Count XI fails as to all defendants, including Rebecca Neal, because Orlando has only alleged emotional harm. Negligent infliction of emotional distress claims must entail either physical impact or alleged emotional disturbance combined with physical injury that was "the natural result of fright or shock proximately caused by the defendants' alleged negligence." Delk v. Columbia/HCA Healthcare Corp., 259 Va. 125, 137-38, 523 S.E.2d 826, 833-34 (2000) (citing Hughes v. Moore, 214 Va. 27, 34, 197 S.E.2d 214, 219 (1973)). Orlando's allegation that the "severe emotional and mental distress" he suffered was "the natural result[] of the physical injuries" caused by defendants' "failure to use due diligence and investigate Defendant BRISTOL NEAL's claims" is not plausible. Compl., ECF No. 1, ¶ 260. Nothing in the complaint actually describes any physical injury, and the notion that information in a search warrant caused a physical impact or physical injury is implausible. Thus, Count XI is dismissed.

Orlando seeks punitive damages in Count XII. The recovery of punitive damages is not a stand-alone cause of action. Rather, an award of punitive damages, if supported by the evidence, is a remedy for certain claims. Craven v. Novelli, 661 F. Supp. 3d 430, 454-55 (W.D.N.C. 2023) (explaining that a "claim" for punitive damages is not a separate cause of action). Here, the only claim for which punitive damages may be recovered, if proven at trial, is Count III's Section 1983 claim of First Amendment retaliation. Id. (stating that punitive damages may sometimes be available against individual Section 1983 defendants where a jury could conclude that the officers "engaged in willful, wanton, or grossly negligent conduct").

Because Orlando's claim for punitive damages is a remedy recoverable, if proven, for breach of Count III, Count XII will be dismissed as moot.

In Count XIII, Orlando alleges that Smith committed defamation per se by publishing the affidavit used to support the search warrant "with local news organizations," either knowing its contents were false or with reckless disregard for their truth. Id. ¶¶ 267-84. To prove defamation in Virginia, a plaintiff must show "(1) a publication of (2) an actionable statement with (3) the requisite intent." Jordan v. Kollman, 269 Va. 569, 575, 612 S.E.2d 203, 206 (2005). "Words that are defamatory per se include '[t]hose which impute to a person the commission of some criminal offense involving moral turpitude.'" Young v. Perry, No. 4:16-cv-060, 2017 WL 836036, at *4 (W.D. Va. Mar. 2, 2017) (quoting Tronfeld v. Nationwide Mut. Ins. Co., 272 Va. 709, 713, 636 S.E.2d 447, 449-50 (2006)). A statement accusing Orlando of committing sexual assault would thus be defamatory per se.

However, "the maker of an absolutely privileged communication is accorded complete immunity from liability even though the communication is made maliciously and with knowledge that it is false." Linderman v. Lesnick, 268 Va. 532, 537, 604 S.E.2d 55, 58 (2004). This privilege "is broad in scope and applies to communications made in proceedings pending in a court or before a quasi-judicial body," and the communication "need only be relevant and pertinent to the case to be protected by the privilege." Id. Here, Orlando alleges that the defamatory comments were part of an affidavit submitted in support of a search warrant—plainly a communication made in a proceeding pending before a court. See Darnell v. Davis, 190 Va. 701, 708, 58 S.E.2d 68, 71 (1950) (applying absolute privilege to a written request for the dismissal of a warrant); Daniczek v. Spencer, 156 F. Supp. 3d 739, 752-53 (E.D. Va. 2016)

(concluding that statements made in a warrant affidavit are covered be absolute privilege under Virginia law). Accordingly, the statements in the affidavit are protected.

Smith's subsequent publication of the affidavit "with local news organizations" did not vitiate absolute privilege in this case because at the time of publication, the affidavit was already a public record. Some courts have held that absolute judicial privilege does not extend to re-publication of privileged material in the press. See Williams v. Kenney, 379 N.J. Super. 118, 135, 877 A.2d 277, 287 (N.J. Super. Ct. App. Div. 2005) (internal quotations omitted) ("Otherwise, a person could file defamatory statements in a judicial proceeding with impunity and then proceed to republish [them] at will under the cloak of immunity."); Pisharodi v. Barrash, 116 S.W.3d 858, 864 (Tex. App. 2003) ("Although libelous statements made in connection to a judicial proceeding are absolutely privileged, re-publication of such statements outside of the judicial context waives the privilege."). However, under Virginia law, warrant affidavits are generally open to the public after the warrant is executed or 15 days after issuance, whichever comes earlier. Va. Code Ann. § 19.2-54. The warrant here was also temporarily sealed until October 5, 2022. 47 South Windsong Court Search Warrant, ECF No. 108-1 at 25. Thus, the warrant became available to the public when it was both executed and unsealed on October 5. Compl., ECF No. 1, ¶ 169. Orlando alleges the warrant was published to the local press "following the execution of the warrant," Id. ¶ 267, which would mean that the affidavit was published after October 5—when it was already properly available for "inspection by the public," Va. Code Ann. § 19.2-54. A defamation claim cannot be based on the re-publication of information that is already a matter of public record. Alexandria Gazette Corp. v. West, 198 Va. 154, 159-60, 93 S.E.2d 274, 279 (1956) ("The publication of public

records to which everyone has a right of access is privileged, if the publication is a fair and substantially correct statement of the transcript of the record."). Thus, because absolute privilege applies to the statements in the affidavit itself and because the affidavit was not shared with the press until it was already a public record, Count XIII must be dismissed.

In Count XIV, Orlando alleges that Smith and Jenkins engaged in a civil conspiracy in violation of Va. Code Ann. §§ 18.2-499 and 18.2-500. However, Smith and Jenkins are entitled to intracorporate immunity. The doctrine "deems multiple defendants a single entity for the purpose of analyzing a civil conspiracy claim if such defendants are employees or agents of the same entity and are acting within the scope of their employment/agency." Vollette v. Watson, 937 F. Supp. 2d 706, 727 (E.D. Va. 2013). Here, Smith and Jenkins both worked for the Augusta County Sheriff's Office, and they spoke with August County residents wishing to report criminal activity and pursued the search warrant for 47 South Windsong Court as part of their official duties. Accordingly, they are protected by intracorporate immunity. See also Misjuns v. Lynchburg Fire Dep't, No. 6:21-cv-025, 2023 WL 3026727, at *9 (W.D. Va. Apr. 20, 2023) (finding that intracorporate immunity shielded several Lynchburg city officials from a civil conspiracy claim under Virginia law). Additionally, Orlando has not alleged any facts pointing to an agreement between Smith and Jenkins and the Neal defendants or to an attempt by Smith and Jenkins to procure the participation of the Neal defendants in their investigation. Va. Code Ann. § 18.2-499. To the contrary, according to the warrant affidavit, it was the Neals who "requested an in-person meeting" with Sheriff Smith to report sexual abuse. 47 South Windsong Court Search Warrant, ECF No. 108-1 at 8. Count XIV is thus dismissed.

## IX.

For the reasons stated above, the motion to dismiss is **GRANTED in part** and **DENIED in part**. Counts I, II, VII, VIII, X, XI, XII, XIII, and XIV are **DISMISSED**, and the motion is **DENIED** as to Count III.

All claims against Rebecca Neal and Bristol Neal in this case are **DISMISSED**, and Rebecca Neal and Bristol Neal are **DISMISSED** as defendants in this case.

An appropriate order will be entered.

Entered: *November 18, 2024*

Michael F. Urbanski
Senior United States District Judge